RANDY S. GROSSMAN
United States Attorney
STEVE B. CHU
Assistant U.S. Attorney
California State Bar No.: 221177
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 546-7167
Facsimile: (619) 546-7751
Email: steve.chu@usdoj.gov

Attorneys for Defendant
United States of America

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: **'22 CV 1791 WQHAHG** |
| Petitioner, | |
| v. | INDEX OF EXHIBITS IN SUPPORT OF THE UNITED STATES FEDERAL AVIATION ADMINISTRATION'S PETITION TO ENFORCE ITS SUBPOENA TO WILLIAM WAGNER |
| WILLIAM WAGNER | |
| Respondent. | |

| EXHIBIT | DESCRIPTION | PAGES |
|---|---|---|
| A | FAA Document Subpoena | 001-006 |
| B | FAA Deposition Subpoena | 007-020 |
| C | Objections and Motion to Quash | 021-079 |
| D | Letter from USA dated August 19, 2022 | 080-082 |

DATED:     November 10, 2022        Respectfully submitted,

RANDY S. GROSSMAN
United States Attorney

 s/ Steve B. Chu

STEVE B. CHU
Assistant United States Attorney
Attorneys for the United States

# EXHIBIT A



U.S. Department
of Transportation

Office of the Chief Counsel

Enforcement Division
Midwest Team

**Federal Aviation
Administration**

**VIA FED-EX OVERNIGHT MAIL**

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Re:    In the Matter of the Safety Investigation Relating to Lance Ricotta.

To Whom It May Concern:

Attached is a Subpoena Duces Tecum requiring the production of documents (see definition of
"documents" on the subpoena) necessary for the Federal Aviation Administration (FAA)'s
above-referenced investigation by March 31, 2022. Specifically the FAA investigation is related to
alleged flight operations conducted by Lance Ricotta while Mr. Ricotta may have been required to hold
an air carrier certificate in order to conduct such operations.

If you have any questions regarding the subpoena, please contact the undersigned attorney.

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

By:    BRIAN K     Digitally signed by
       KHAN        BRIAN K KHAN
                   Date: 2022.03.16
                   13:44:11 -04'00'

       Brian K. Khan, Esq.
       Enforcement Division, Midwest Team
       AGC-300, Room 917M
       800 Independence Avenue SW
       Washington, D.C. 20591
       T: 202-267-4771
       F: 202-267-5106
       E: brian.k.khan@faa.gov

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
OFFICE OF THE CHIEF COUNSEL
ENFORCEMENT DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO<br><br>LANCE RICOTTA | SUBPOENA DUCES TECUM |

To:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

At the insistence of the Federal Aviation Administration (FAA), you are hereby required to produce records or other documents required for the subject investigation as directed below. This investigation is related to alleged flight operations conducted by Lance Ricotta while Mr. Ricotta may have been required to hold an air carrier certificate in order to conduct such operations.

## DEFINITION OF "DOCUMENTS"

For the purposes of this subpoena, "documents" means information stored in any form; any written, recorded or graphic matter, however produced or reproduced; and copies and drafts thereof., and may include correspondence; telegrams; electronic mail; memoranda; reports; notes; drafts; minutes; contracts; agreements; books; records; vouchers; invoices; purchase orders; diaries; logs; computer printouts; memory programs; information stored in computer application, in whatever form; backup materials of any kind; card files; press clippings; newspapers or newsletters; sworn or unsworn statements or employees; lists; audits; deposit slips or cancelled checks; monthly or other periodic statements; ledgers; journals; notices; affidavits; court papers; appointment books; minutes or records of conferences or telephone calls; receipts; written reports or opinions of investigators or experts; status reports; drawings; charts; photographs; or recordings within your possession, or subject to your control,

of which you have knowledge, or to which you now have, or have had access, or of which any of your agents, attorneys, accountants, or consultants have knowledge.

**DOCUMENTS TO BE PRODUCED**:

For the period between January 1, 2020, to the present:

1) Operating agreements, aircraft lease agreements, lease contracts, management contracts, management agreements, and/or memoranda of agreements related to transportation by air provided to William Wagner or Wagner Aeronautical, Inc. by Lance Ricotta or his associates.

2) Invoices prepared or received by you related to transportation by air provided to William Wagner or Wagner Aeronautical, Inc. by Lance Ricotta or his associates.

3) Documents sent or received containing names, addresses, telephone numbers, and electronic mail addresses of any and all individuals and/or entities of Lance Ricotta or his associates who arranged transportation by air for William Wagner or Wagner Aeronautical, Inc.

4) Provide all documents regarding payments William Wagner or Wagner Aeronautical Inc. made to any individual or entity for flights conducted by Lance Ricotta or his associates. .

For the purposes of this subpoena, Wagner Aeronautical, Inc. includes William Wagner and any and all adjunct or subsidiary organizations and institutions under Wagner Aeronautical, Inc.'s management, responsibility, or control.

**DEADLINE FOR RECEIPT BY THE FAA OF DOCUMENT PRODUCTION**:

March 31, 2022

**PLACE FOR PRODUCTION OF DOCUMENTS**: The specified documents must be mailed or hand-delivered or otherwise produced to:

David Voelker
Aviation Safety Inspector
Special Emphasis Investigations Team, AFG-610
Van Nuys FSDO
16501 Sherman Way, Ste. 330
Van Nuys, CA 91406
Telephone: 817-247-5942
Email: david.t.voelker@faa.gov

## AUTHORITY

This subpoena is issued pursuant to the provisions of 14 Code of Federal Regulations (C.F.R.) Section 13.3, is authorized under the provisions of 49 United States Code (U.S.C.) Sections 40113(a), 46101, 46104, 46313, and is judicially enforceable under 49 U.S.C. Section 46104(b).

You are required to provide the requested records by the appointed time. Moreover, refusal to comply with this subpoena may result in criminal prosecution pursuant to 49 U.S.C. Section 46313.

The undersigned, an officer designated by the Administrator of the Federal Aviation Administration, executed this subpoena in Washington, D.C., this 15th day of March, 2022.

CYNTHIA A
DOMINIK
Digitally signed by CYNTHIA
A DOMINIK
Date: 2022.03.15 13:44:58
-04'00'

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Subpoena Duces Tecum regarding In The Matter Of The Safety Investigation Relating To Lance Ricotta, has been sent this date by FedEx – overnight delivery to:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Dated:      **MAR 1 6 2022**

Jeff Kamberg, Management and Program Analyst
Enforcement Division-Western Team
National Enforcement Program
Federal Aviation Administration
Des Moines, Washington

# EXHIBIT B



U.S. Department
of Transportation

**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Midwest Team
2300 East Devon Ave.
Des Plaines, IL 60018

VIA FEDERAL EXPRESS OVERNIGHT DELIVERY

April 27, 2022

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Dear Mr. Wagner:

Re:   IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO LANCE
      RICOTTA.

Enclosed you will find a Subpoena. It requires your appearance in the referenced case on the date, and at the time and location noted therein. You will be required to give testimony as to certain facts known to you pertaining to this case.

You will receive a witness fee as established by law; along with claimed travel expenses associated with your appearance on May 5, 2022 at 2:00 p.m. Pacific Daylight Time in the San Diego Flight Standards District Office at Montgomery-Gibbs Executive Airport, 8525 Gibbs Drive, San Diego, CA 92123. We will need you to email or fax a copy, as soon as possible, of the enclosed "Enterprise Services Center eTravel New Profile Request Form" form with your personal information updated. This information is required to set-up electronic deposit of payment. A Claim for Witness Attendance Fees, Travel, and Reimbursable Expenses is enclosed for your use in claiming expenses. *The completed (original) signed document and all receipts must be returned to us after the Hearing for deposit of electronic payment.*

Should you have any questions regarding the travel forms or expenses, please contact Management and Program Analyst, Sebrina Sirna, at (816) 329-3767; Fax (816) 329-3771; or email sebrina.sirna@faa.gov

2

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

By: **BRIAN K KHAN**   Digitally signed by BRIAN
K KHAN
Date: 2022.04.27 13:08:42
-04'00'

Brian K. Khan, Esq.
Office of the Chief Counsel
Enforcement Division, Midwest Team
AGC-300, Room 917M
800 Independence Avenue SW
Washington, DC 20591
Email: brian.k.khan@faa.gov
Telephone:  (847) 294-7313 (Main)
                    (202) 267-4771 (Direct)
Fax:            (202) 267-5106

Enclosures



U.S. Department
of Transportation                    Office of the Chief Counsel                    Enforcement Division
**Federal Aviation**                                                                Midwest Team
**Administration**

## VIA FED-EX OVERNIGHT DELIVERY

April 27, 2022

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Re:   **IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO LANCE
       RICOTTA.**

Dear Mr. Wagner:

Attached is a subpoena for deposition. This deposition is necessary as part of the Federal
Aviation Administration's investigation relating to the above-captioned matter. Specifically the
FAA investigation is related to alleged flight operations conducted by Lance Ricotta while Mr.
Ricotta may have been required to hold an air carrier certificate in order to conduct such
operations.

Standard Form 1157, Claim for Witness Attendance Fees, Travel, and Miscellaneous Expenses
and Instructions to Witness, is enclosed. Please complete the Standard Form 1157 after the
deposition, and return it to this office within one week of the completion of the deposition. If you
have any questions regarding reimbursable expenses or the completion of this form, please
contact the undersigned attorney.

Upon your receipt of this subpoena, please contact the undersigned attorney to discuss this
matter.

2

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

By:

BRIAN K
KHAN

Digitally signed by BRIAN K
KHAN
Date: 2022.04.27 09:58:08
-04'00'

Brian K. Khan, Esq.
Enforcement Division, Midwest Team
AGC-300, Room 917M
800 Independence Avenue SW
Washington, D.C. 20591
T: 202-267-4771
F: 202-267-5106
E: brian.k.khan@faa.gov

3

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
OFFICE OF THE CHIEF COUNSEL
ENFORCEMENT DIVISION

IN THE MATTER OF THE SAFETY
INVESTIGATION RELATING TO LANCE
RICOTTA.

SUBPOENA FOR DEPOSITION

TO:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

At the instance of the Federal Aviation Administration (FAA), you are hereby required to appear
before a person having the power to administer oaths, at the date, time and place specified below,
and to give testimony under oath pertinent to the subject investigation. Specifically, the FAA will
depose you regarding transportation by air provided to you by Lance Ricotta.

**DATE AND TIME FOR TAKING OF DEPOSITION:**

Date: May 5, 2022
Time: 2:00 P.M. Pacific Daylight Time

**PLACE FOR TAKING OF DEPOSITION:**

This deposition will take place at:

San Diego Flight Standards District Office
Montgomery-Gibbs Executive Airport
8525 Gibbs Drive
San Diego, CA 92123

4

## AUTHORITY

This subpoena is issued pursuant to the provisions of 14 Code of Federal Regulations (C.F.R.) Section 13.3, is authorized under the provisions of 49 United States Code (U.S.C.) Sections 40113(a), 46101, 46104, 46313, and is judicially enforceable under 49 U.S.C. Section 46104(b).

You are required to attend and to testify at this deposition at the appointed time. Moreover, refusal to comply with this subpoena may result in criminal prosecution pursuant to 49 U.S.C. Section 46313.

The undersigned, an officer designated by the Administrator of the Federal Aviation Administration, executed this subpoena in Washington, D.C., this 26th day of April 2022.

CYNTHIA A   Digitally signed by CYNTHIA A
DOMINIK     DOMINIK
            Date: 2022.04.26 16:40:01
            -04'00'

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

5

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Subpoena for Deposition regarding In The Matter Of The Safety Investigation Relating To Lance Ricotta, has been sent this date by FedEx — overnight delivery to:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Date: 4/27/2022

Yolanda Guile

## INSTRUCTIONS TO WITNESS

A witness attending on behalf of the Federal Aviation Administration is entitled to the following:

> $40 for each day's attendance and for the time necessarily occupied in going to and returning from the hearing.

> 0.56 cents per mile for going from and returning to residence/place of business via privately owned vehicle or for the actual expense of travel via common carrier (air, train, bus, taxi, etc.) at the most economical rate reasonably available. If two or more people are sharing ride then only one person may claim mileage. If travel by air is the method chosen, please contact our office, and we will make the travel arrangements.  If you make your common carrier travel arrangements, then you must provide a receipt showing the actual cost of travel by common carrier.

> Charges for toll roads, bridges, tunnels and ferries, taxicab fares between place of lodging and carrier terminals, and parking fees (receipts must be furnished for parking fees and any other single item in excess of $75).

> Lodging and miscellaneous and incidental expenses (M&IE) will be paid to the witness **if required to remain overnight**.  Receipts for lodging must be furnished (meal receipts are not required).  The per diem and transportation expenses of witnesses will be paid in accordance with 28 U.S.C. §1821.  In San Diego, California a maximum of $181.00 for lodging (plus lodging tax (es) and $77.00* M&IE (which includes meals) is allowed per day. *($56.00 on first and last day of travel)

In order to receive reimbursement for the expenses you incur, you must complete the information on the attached Enterprise Services Center eTravel New Profile Request Form and **return it to our office no later than 2 days after your receipt of the form**. (Fax 816-329-3771, Attn: Sebrina Sirna) An invitational travel order will be prepared for you and sent to you prior to the hearing date.

Witness reimbursement will be direct deposited into the financial institution account you provided on the New User Request form.  When your witness commitment is over, you must provide our office with hotel receipts (if any), common carrier receipts (if any), receipts for any other items over $75, and a list of other expenses you incurred as a result of your participation as a witness.  When our office receives your expense list, we will prepare a travel voucher that will be sent to you for signature when the voucher is completed.  You will be required to sign the voucher and mail it back to our office.

Mail the completed Claims for Witness Attendance Fees, Travel, and Reimbursable Expenses form to:

> Ms. Sebrina Sirna
> FAA Central Regional Office, AGC-300
> Enforcement Division, Midwest Team
> 901 Locust, Room 506
> Kansas City, MO  64106-2641

*It is requested that your claim be submitted for payment as soon as possible after the hearing and in no event be delayed beyond 30 days.  Our fiscal year-end occurs on September 30th of each year.  Therefore, if you are a witness for a hearing that occurs in September, please be advised that your expenditures must be received in our office within 7 days following the conclusion of the hearing.  Voucher information submitted after September 15 of each year will not be processed for payment until after October 1.*

## PRIVACY ACT NOTICE

This notice is provided in accordance with Section (e)(3) of the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested on the enclosed witness claim form.

A.   Authority.  This information is solicited pursuant to 28 U.S.C. 1821.  Submission of the telephone number is voluntary and submission of the Social Security Number (SSN) is mandatory.  The Accounting system currently in use by the Federal Aviation Administration (FAA) requires the Social Security Number be provided in order for the Agency to reimburse FAA employees and non-FAA employees for expenses incurred.  The request for information is intended to facilitate the processing of your claim and ensure payment following your participation in the hearing in question.

B.   Principal purpose.  The requested information is intended to assist the agency in processing your witness claim and ensuring that payment of your claim is accomplished.

C.   Routine uses.  Records from this system of records may be disclosed in accordance with the routine uses as they appear in System of Records No. DOT/FAA 847 as published from time to time in the Federal Register.

D.   Effect of failure to respond.  If you do not provide the SSN information, your claim will not be processed, and you will not be reimbursed for expenses incurred.

# eTravel New Profile Request

**PRIVACY ACT STATEMENT**: This statement is provided pursuant to the Privacy Act of 1974, 5 USC § 552a.

AUTHORITY:  Solicitation of the information on this form is authorized by 5 U.S.C. Chap. 57 as implemented by the Federal Travel Regulations (FPMR 101-7), E.O. 11609 of July 22, 1971, E.O. 110012 of March 27, 1962, E.O. 9397 of November 22, 1943, and 26 U.S.C. 6011(b) and 6109.

PURPOSE: The primary purpose of the requested information is to determine payment or reimbursement to eligible individuals for allowable travel and/or relocation expenses incurred under appropriate administrative authorization and to record and maintain costs of such reimbursements to the Government.

ROUTINE USE(S):  The information will be used by officers and employees who have a need for information in the performance of their official duties.  The information may be disclosed to appropriate Federal, State, local, or foreign agencies when relevant to civil, criminal or regulatory investigations or prosecutions, or when pursuant to a requirement by this agency in connection with the hiring or firing of an employee, the issuance of a security clearance, or investigations of the performance of official duty while in Government service.

Your Social Security Account Number (SSN) is solicited under the authority of the Internal Revenue Code (26 U.S.C. 6011 (b) and 6109) and E.O. 9397, November 22, 1943, for use as a taxpayer and/or employee identification number; DISCLOSURE:  Disclosure is MANDATORY on vouchers claiming travel and/or relocation allowance expense reimbursement which is, or may be, taxable income. Disclosure of your SSN and other requested information is voluntary in all other instances; however, failure to provide the information (other than SSN) required to support the claim may result in delay or loss of reimbursement.

**ESC**

Enterprise Services Center
*eTravel New Profile Request*

*Must Use Full Legal Name*

| FIRST | | MIDDLE | | LAST | |
|---|---|---|---|---|---|

**GOVERNMENT EMAIL** | *Note for Invitational Travelers provide Arranger email*

**SOCIAL SECURITY NUMBER** | OFFICE PHONE

**RESIDENCE ADDRESS**

CITY | STATE | ZIP

### ORGANIZATION INFORMATION

MINOR CUSTOMER

ROUTING TEMPLATE

*USER ACCESS* Check All That Apply | ☐ TRAVELER | ☐ ROUTING LIST OFFICIAL (Reviewer, Fund Certifier, Approver) | ☐ ARRANGER

| USER TYPE | | DOCUMENT VIEW ACCESS | |
|---|---|---|---|
| ARRANGER ACCESS | | REPORTS ACCESS | |
| APPROVER ACCESS | | TRAVEL CARD USE | |

COMMENTS:

### DIRECT DEPOSIT INFORMATION

*All travelers and approvers must complete this section – if user is an E2 preparer only, notate in comments section 'PREPARER ONLY'*

FINANCIAL INSTITUTION NAME

NAME ON BANK ACCOUNT

9-DIGIT ROUTING NUMBER | ACCOUNT NUMBER

ACCOUNT TYPE | ☐ CHECKING | ☐ SAVINGS

**\*TRAVELER/USER SIGNATURE:**

### AGENCY APPROVAL

*NAME* | *GOVERNMENT EMAIL*

**\*APPROVER'S SIGNATURE:**

Form instructions are located on the ESC website (www.esc.gov/tsTravel.asp) under the eTravel System Administration section.  If you have additional questions completing the form, contact the ESC eTravel Helpdesk at 866-641-3500 opt **7. Fax completed form to 405-954-5798.**
<u>*Form must be signed by both user and approver</u>

018

OFFICE OF THE REGIONAL COUNSEL, CENTRAL REGION
## CLAIMS FOR WITNESS ATTENDANCE FEES, TRAVEL, AND REIMBURSABLE EXPENSES

**GENERAL INFORMATION:**               Case Name & Case No. : Lance Ricotta

Witness Name: Mr. William Wagner          Are you a U.S. Citizen?  Yes ( X )   No ( )

Social Security No.: _____          Telephone _____

Address: _____

_____          <u>I  (did)  (did not) receive a prepaid</u>

<u>ticket  for my official travel.</u>

**TRAVEL AND ATTENDANCE INFORMATION:**

Departed: _____          Date: ____ / ____ / ____ Time: _____ AM/PM

_____
(Address of Place of Employment or Residence)

Enroute To: _San Diego, CA _____          Arrival
(City/State of Case Location)          Date: ____ / ____ / ____ Time: _____ AM/PM
Returned to Place of Employment or Residence:          Date: ____ / ____ / ____ Time: _____ AM/PM

### PLEASE DO NOT LEAVE ANY BLANKS

**WITNESS CLAIM FOR FEES AND ALLOWANCE:**

a. Mileage Allowances:  Circle type of privately owned vehicle (auto, motorcycle, aircraft, etc.):
   From Residence/Employment to Case Location <u>and Return</u>:
   Total miles: _____ X _____ =
   ($0.56 auto)          $ _____

b. Miscellaneous Allowances:  Tolls, taxi, parking, etc.          $ _____

c. Witness Fee Allowances:  $40.00 X _____ =          $ _____
   (No. of Days)

d. Lodging Expenses (**Provide receipt**)          $181.00 X _____ =   $ _____
   Actual amount not to exceed $N/A__          (No. of Days)

e. Maximum M&IE* Allowed for this Location: $77.00* or 56.00** _____ = $ _____
   (*Misc. & Incidental Expenses) (**first/last day)          (No. of Days)

Items "d. Lodging" and "e. M&IE" are included in the Per Diem dollar amount specifically set for this Case Location (City and State). You will be reimbursed for lodging and miscellaneous & incidental expenses (M&IE) only if you are required to remain overnight. PLEASE NOTE, RENTAL VEHICLE REIMBURSEMENT IS NOT ALLOWED. You must include airline ticket and lodging receipts. A receipt is required for all amounts claimed in excess of $75.00.  (NOTE: Falsification of an item in an expense account works a forfeiture of claim (28 U.S.C. 2514) and may result in a fine of not more than $10,000 or imprisonment for not more than 5 years, or both (18 U.S.C. 287, i.d. 1001.)

### WITNESS CERTIFICATION
I certify that the above data is correct and that payment has not been received, and that at the time of travel and attendance I (was) (was not)  a citizen of the United States.  (If not a citizen, a copy of your Alien Registration Record must accompany this form.)
(Signature) _____          Date _____

(FOR OFFICIAL USE ONLY)
### ATTENDANCE CERTIFICATION
I certify that the witness named above attended the hearing in the case or matter indicated and is entitled to the statutory allowances for attendance and travel.
(Signature) _____          Date _____

Accounting Appropriation Data: _____

### PLEASE COMPLETE THIS FORM IN ITS ENTIRETY
AFTER COMPLETION:  Please return this form to:  **FAA Central Regional Office, AGC-300, Enforcement Division, Midwest Team, 901 Locust, Room 506, Kansas City, MO  64106.**

4/27/22, 2:18 PM                                    FedEx Ship Manager - Print Your Label(s)

    Shipment Receipt

**Address Information**
**Ship to:**                          **Ship from:**
  William Wagner                        Brian K. Khan, Esq.
  Wagner Aeronautical, Inc.             FAA Office of the Chief
                                        Counsel
  613 W. Valley Parkway Ste             AGC-300, Room 914A
220

                                        800 Independence Avenue
                                        SW
  ESCONDIDO,  CA                        Washington,  DC
  92025                                 20591
  US                                    US
  2022674771                            2022674771


**Shipment Information:**
Tracking no.: 776708257031
Ship date: 04/27/2022
Estimated shipping charges:  5.57 USD

**Package Information**
Pricing option: FedEx Standard Rate
Service type: Priority Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 1   LBS
Declared Value: 0.00  USD
Special Services:
Pickup/Drop-off: Use an already scheduled pickup at my location

**Billing Information:**
Bill transportation to: MyAccount-037
Your reference:
P.O. no.:
Invoice no.:
Department no.:

Thank you for shipping online with FedEx ShipManager at fedex.com.

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

020

# EXHIBIT C

# UNITED STATES OF AMERICA
## NATIONAL TRANSPORTATION SAFETY BOARD
### WASHINGTON, D.C.

|  |  |  |
|---|---|---|
| In the matter of the safety | ) | |
| Investigation relating to | ) | **SUBPOENA DUCES** |
|  | ) | **TECUM** |
| Lance Ricotta | ) | |
|  | ) | |
|  | ) | |
|  | ) | |

## TO THE FEDERAL AVIATION ADMINISTRATION
### OFFICE OF THE CHIEF COUNSEL
### ENFORCEMENT DIVISION:

WILLIAM WAGNER, by his undersigned counsel, hereby responds to the numbered paragraphs in the Administrator's Subpoena Duces Tecum as Follows:

1) Operating Agreements, aircraft lease agreements, lease contracts, management contacts, management agreements, and/or memoranda of agreements related to transportation by air provided to William Wagner or Wagner Aeronautical, Inc. by Lance Ricotta or his associates.

   **RESPONSE: OBJECTION-** Vague as to time, overbroad and oppressive.

2) Invoices prepared or received by you related to transportation by air provided to William Wagner or Wagner Aeronautical, Inc. by Lance Ricotta or his associates.

   **RESPONSE: OBJECTION-** Vague as to time, overbroad and oppressive.

3) Documents sent or received containing names, addresses, telephone numbers, and electronic mail addresses of any and all individuals and/or entities of Lance Ricotta or his associates who arranged transportation by air for William Wagner or Wagner Aeronautical, Inc.

**RESPONSE: OBJECTION-** Vague as to time, overbroad, and oppressive.

4) Provide all documents regarding payments William Wagner or Wagner Aeronautical Inc. made to any individual or entity for flights and conducted by Lance Ricotta or his associates.

**RESPONSE: OBJECTION-** Vague as to time, overbroad, and oppressive.

May 25, 2022

Respectfully submitted,


By:_____

Edward A. Rose, Jr., Esq.
Texas Bar 24081127
3027 Marina Bay Drive  Suite 208
League City, Texas  77573
Telephone (713) 581-6029
Facsimile  (832) 201-9960
edrose@edroseattorneycpa.com

023

**CERTIFICATE OF SERVICE**

I certify that the foregoing **Response to the Subpoena Duces Tecum** has been served this day by email upon the following:

Federal Aviation Administration
Office of the General Counsel
Attn: Brian K. Khan, Esq.
AGC-300, Room 917M
800 Independence Avenue SW
Washingto, DC 20591
By email: brian.k.khan@faa.gov

Telephone: (847) 294-7313 (Main)

        (202) 267-4771 (Direct)

Fax:     (202) 267-5106

 

                                     /s/ by Edward A. Rose, Jr.

 

_____

Edward A. Rose, Jr., Attorney at Law

3027 Marina Bay Drive  Suite 208
League City, Texas  77573
Telephone (713) 581-6029
Facsimile  (832) 201-9960
edrose@edroseattorneycpa.com

CHRISTOPHER S. MORRIS, ESQ.
JACOB A. GILLICK, ESQ.
MORRIS LAW FIRM, APC
501 WEST BROADWAY, SUITE 1480
SAN DIEGO, CA 92101

| IN THE MATTER OF THE SAFETY INVESTIGATION RELATED TO LANCE RICOTTA | MOTION TO QUASH SUBPOENA FOR DEPOSITION OF MR. WILLIAM WAGNER |
|---|---|

Petitioner Lance Ricotta ("Lance"), as a party to the matter, hereby moves to Quash the subpoena served on William Wagner and Wagner Aeronautical Inc., as set forth below and in the Declaration of Lance Ricotta. Relief is sought pursuant to Title 14 of the Code of Federal Regulations ("CFR"), section 13.228(b).

## I.

## <u>INTRODUCTION</u>

This is the second time Lance has had to file a Motion to Quash as subpoena on Mr. Wagner and Wagner Aeronautical Inc. Instead of addressing the first motion, it appears that a new subpoena was served on Mr. Wagner and Wagner Aeronautical Inc., with the hopes that Lance would not be informed. Lance has a very vested interest in protecting his business, reputation, and clients and therefore submits this second Motion to Quash and requests a hearing be held.

By way of background, Brothers Lance Ricotta ("Lance") and Thomas Ricotta ("Tom") have been embattled in contentious litigation for years regarding the ownership of Lancair Corporation ("Lancair"), which operates an FBO at Brown Field. Specifically, Lance has been able to prove that Tom was stealing money from Lancair and had misappropriated its shares by amending their mother's estate documents after she underwent a partial lobotomy.

Seeing all of his bad acts coming to a head, Tom has resorted to filing false claims with different authorities in order to have his brother arrested. Lance has done nothing wrong, but the FAA keeps harassing him because of Tom's false reporting. Tom admits to this scheme in videos attached to this motion where he tells Lance, in front of Lance's teenage son that Lance is going to lose on everything because the FAA is going to "crawl up your ass."

1

A specific effect of this harassment campaign has been a loss of business for Lance along with a fear of being wrongfully accused of something he did not do. Lance has worked with the subpoenaed party, William Wagner ("Wagner"), for over 25 years. Now, given this subpoena, Wagner has indicated that he and his entities will no longer work with Lance. This makes sense as Wagner and/or his company, Wagner Aeronautical Inc., are concerned about being dragged into Tom's scheme and losing certain FAA certifications as punishment for not having any damaging information on Lance. If Lance does not stand up for himself, and his clients, the FAA will ruin everything he has been working to build.

As described herein, the subpoena is improperly vague, overbroad, oppressive, and procedurally deficient. On those grounds, Lance requests the subpoena for Wagner's deposition be quashed.

## II.

## RELEVANT BACKGROUND FACTS

On March 15, 2022, Brian K. Kahn, Esq., of the Federal Aviation Administration ("FAA") Enforcement Division, Midwest Team, sent a deposition subpoena to William Wagner ("Wagner"), with Wagner Aeronautical, Inc., set for April 7, 2022. A true and correct copy of the subpoena is attached hereto as "Exhibit 1." The only information provided in the subpoena as to the topic being discussed was: "transportation by air provided to you by Lance Ricotta." (*Ibid.*) Wagner and Petitioner Lance Ricotta ("Lance") have worked with each other for over 25 years, which includes the sale of two aircrafts and Lance acting as Wagner's Chief Pilot. Lance submitted a Motion to Quash this subpoena to which the FAA did not respond nor schedule a hearing. It has come to Lance's attention that the FAA then re-served the exact same subpoena again on Wagner with a production date of May 26, 2022.

It is believed that the current investigation by the FAA into Lance started on or around November 1, 2018. It was re-started on November 30, 2021. The re-started investigation is now over 120 days old – well beyond the 75-day limit for such investigations. (See FAA National Policy, Chapter 4, subdivision 4(e).) In addition, when it comes to the suspension or revocation of a license or certificate, the stale complaint rule provides that an FAA complaint will be dismissed if the offenses alleged occurred more than six months prior to the Administrator's advising a respondent of the reasons for the proposed action. Given the long

2

history of investigation, and in light of the absence of any compliant notification or action, this investigation is untimely and any and all enforcement activity should have ceased.

In addition to this significant delay, the individual investigators have displayed a biased and prejudiced approach to their work. This investigation finds its origins in complaints lodged by Tom, Lance's brother, an individual with whom Lance has been in litigation with for almost five years. There is a direct correlation between Tom's complaints and "information" to the FAA regarding Lance and negative and harmful evidence uncovered in the underlying litigation. Sensing the impending loss on the merits, Tom has focused on bankrupting his brother and is using FAA investigators to do his bidding. The fact that FAA investigators have taken the information proffered by Tom at face value is surprising; but what is even more shocking are the tactics they have employed.

By way of background, Lance was the original founder of Lancair Corporation ("Lancair"), the FBO at Brown Field. Shortly after purchasing the original leasehold, Lance hired his brother Tom as the day-to-day manager of the operation and awarded him with 10% of the Lancair corporate stock.

In connection with Lance's guilty plea to a logbook violation, he was counseled to place his stock in his mother's name. Years later, at a time when Mrs. Ricotta was recovering from traumatic brain injury, lying in a hospital bed unable to speak or communicate, she, according to Tom, transferred 80% of her stock to him. This transfer was hidden from Lance as Tom, the trustee, assured Lance he was still a 50% owner and continued to represent that the bi-annual payments were for Lance's 50% ownership interest in the FBO.

The transfer remained hidden until Lance, years after his mother death, asked for a simple accounting. But when he did, his brother refused by citing the alleged transfer documents with a threat to enforce them. (Attached hereto as Exhibit 2 please find the probate petition filed in this matter.) In the ensuing litigation, Mrs. Ricotta's treating physician testified that there was no way Mrs. Ricotta could have understood, comprehended, or agreed to the transfer outlined in the documents allegedly signed by her. This deposition, which took place on March 10, 2020, was a game changer.

We suspect that this date will correspond with the volume of complaints being lodged by Tom who, at that time, was well aware that he stands to be disinherited.

3

(Attached hereto as Exhibit 3 please find excerpts from the deposition of Dr. Spier, Mrs. Ricotta's treating physician.)

As part of the litigation, Judge Meyer has enjoined Tom from selling the FBO as he had been threatening. (Attached hereto as Exhibit 4 is the order from the Honorable John Meyer.) This injunction was based, in part, on the judge's finding that Lance was, more likely than not, to prevail on the merits of his claims that the documents allegedly signed by Mrs. Ricotta at the behest of Tom were procured illegally and that Tom had been misappropriating millions of dollars from Lancair.

Since November 30, 2021, FAA investigators have conducted the following ramp checks of Lance:

1.  Gulfstream, tail number N270MC, San Diego, California, November 1, 2018;
2.  Gulfstream, tail number N270MC, Miami, Florida, November 1, 2018;
3.  Grumman Mallard, tail number N777PV, San Diego, California, July 11, 2019;
4.  Lear, tail number N260GD, Paine Field Washington, November 30, 2021;
5.  Gulfstream, tail number N511PK, Teterboro, New Jersey, November 30, 2021;
6.  Gulfstream, tail number N511PK, San Francisco International, December 1, 2021;
7.  Lear, tail number N260GD, Chino, California, February 8, 2022;
8.  Astra, tail number N565KE, Carlsbad, California, January 26, 2022;
9.  Astra, tail number N565KE, Carlsbad, California, February 10, 2022;
10. Astra, tail number N448GR, Ft. Worth, Texas, March 11, 2022;
11. Ramp Surveillance, King Air N888HJ, Scottsdale, Arizona, March 15, 2022; and
12. Other ramp inspections/surveillance suspected to be discovered with FOI Request.

These "enforcement" activities have been and continue to be immeasurably injurious to Lance, his entities, and now his business contacts. During these ramp checks, the prospective buyers of the aircraft are ushered out of the plane and aggressively questioned by investigators as to the particulars of the flight. On every occasion, the prospective buyers have confirmed the legal, non-chartered, nature of the flight. Nevertheless, the harassment has resulted in the loss of

4

028

various buyers and the cancellation of various contracts – the specific goal Tom had in mind when he lodged the unfounded complaints in the first place. Attached hereto as "Exhibit 5[1]" is a true and correct copy of videos where Tom Ricotta tells Lance that he is going to lose the lawsuit because "the Feds are going to crawl up [his] ass." Thomas made these comments in front of Lance's son, as seen in the video.

Mention must also be made of the activities of FAA Investigator David Baron during the ramp surveillance that took place on March 15, 2022, in Scottsdale, Arizona. On that date, Investigator Baron arrived plain clothed in an unmarked vehicle. He sat in his car videotaping the activities of Lance Ricotta and his passengers. When he was approached by Lance and the FBO ramp security, he accelerated careless and recklessly around taxiing aircrafts and a United States Customs Ramp vehicle -- nearly making contact with Lance and the security guards. Mr. Baron drove off at a high rate of speed trying to escape, and when he got the gate he ran into it. The gate prevented his escape. The FBO personnel contacted the Scottsdale Police. Mr. Baron refused to cooperate with ramp staff and Airport Operation Officers and refused to identify himself. He then tried to escape one more time by hitting Lance Ricotta with his vehicle.

When the police arrived, they cited Mr. Baron for trespass. This type of activity is in stark contravention of his duties as outlined in U.S. Department of Transportation Order 2150.3B, which establishes the policies and procedures for investigations conducted by the FAA. That Order, in particular Chapter 2, Sections 3(e) provides that FAA investigators must "accurately and completely report all facts and conduct their investigations in an unbiased and focused manner. A violation report without all the facts only leads to delays that compromise the objectives of fair and responsive enforcement."

The ramp checks, subpoenas, and dangerous, unskilled, and unprofessional actions of Mr. Baron led inexorably to the conclusion that the FAA's alleged commitment to an unbiased and fair investigation are not being met. (A video excerpt form that interaction is being sent along with this letter as Exhibit 5.) Tom and Lance have had no contact for over five years, the fact that the FAA is still taking his complaints at face-value is concerning. Lance is now required to submit this Motion to Quash in order to protect Wagner from getting caught up in Tom's bad acts. Wagner has indicated that he will likely no longer continue business with

---

[1] Exhibit 5 is contained in the Dropbox Link
https://www.dropbox.com/s/42md0i1grcjkzin/Video%20Mar%2015%2C%2011%2007%2039%20AM.mov?dl=0

029

Lance. This is exactly what Tom is looking for. Further, Lance is concerned that if he does not quash the subpoena, the FAA will punish Wagner for not having any damaging information by threatening any of the FAA certifications he and/or his entity may have.

Lance has lost multiple opportunities due to the false allegations made by Tom and the reckless investigation being conducted by the FAA. This subpoena is just another example of harassment tactics as it is woefully deficient and unenforceable.

## III.

## ARGUMENT

Pursuant to Title 14 of the Code of Federal Regulations ("CFR"), section 13.228(b), "[a] party, or any person upon whom a subpoena has been served, may file in the FAA Hearing Docket a motion to quash or modify the subpoena." In seeking to quash a subpoena, the "[m]ovant must describe, in detail, the basis for the motion to quash or modify the subpoena including, but not limited to, a statement that the testimony, document, or tangible evidence is not relevant to the proceeding, that the subpoena is not reasonable tailored to the scope of the proceeding, or that the subpoena is unreasonable and oppressive. A motion to quash or modify the subpoena will stay the effect of the subpoena pending a decision by the administrative law judge on the motion." (*Ibid.*) As described below, the subpoena is not reasonably tailored and is irrelevant, oppressive, and procedurally deficient.

### A.   The Subpoena is Not Reasonably Tailored

When issuing a subpoena, it "must show its general relevance and reasonable scope." (14 CFR 13.228(a).) One would expect that a copy of the Complaint against Lance would be included with the subpoena to narrow the scope and comply with 13.228(a). However, this did not occur as neither Wagner nor Lance have ever received a copy of any Complaint.

Pursuant to 49 USCS 46101(a), "the FAA shall investigate [a] complaint if a reasonable ground appears." When the FAA investigates a complaint, "[t]he FAA will send a copy of a complaint to. . . the subject(s) of the complaint by certified mail." (See 14 CFR 13.5.) It is likely that no complaint exists because the FAA has already found no reasonable grounds to investigate Wagner about Lance. The

6

subpoena served on Wagner states that "the FAA will depose you regarding transportation by air provided to you by Lance Ricotta." (Exhibit 1.)  That is the totality of information offered.  No attempt is made to choose a specific timeframe during the 25-year relationship or describe what flights the FAA is interested in.

Finally, the subpoena is to William Wagner *and* Wagner Aeronautical, Inc. (*Ibid.*)  It is unclear what capacity Wagner must appear and what transactions or flights he will be asked about.  The vague explanation, improperly overbroad scope, and failure to provide a copy of the Complaint make this subpoena improper.  Therefore, Petitioner requests it be quashed.

### B.   No Explanation of Relevance is Offered

A subpoena may be quashed if the "testimony is not relevant to the proceeding." (14 CFR 13.228(b).)  As described above, no explanation of the matter has been provided to the deponent or Lance, who is the subject of the investigation.  Therefore, there is no way to determine if the testimony is "relevant" to the action.  Given the lack of relevancy, Lance requests the subpoena be quashed.

### C.   The Subpoena is Unreasonable and Oppressive

Lance has already lost out on any future business opportunities with Wagner.  Now, Lance is concerned that the FAA will punish Wagner for not having any damaging information about Lance.  Specifically, and based on information and belief, Wagner and Wagner Aeronautical, Inc., have special FAA certifications which allow them to operate and offer the services they do.  Lance is concerned that the FAA will threaten these certifications.

The FAA has gone to great lengths to harass Lance at the behest of Tom Ricotta, despite Tom and Lance not having contact for five years.  Lance's livelihood has already been negatively impacted by Tom's revenge mission through the FAA.  Lance therefore requests Wagner be protected from any further harassment procedures through the subpoena.

Finally, and as described above, complying with the subpoena, which spans an unknown number of flights and business deals over 25 years, is oppressive.  Given the oppressive nature of the subpoena, Lance requests it be quashed.

031

**D.**     **Service of the Subpoena was Improper**

Pursuant to 14 CFR 13.57 "[s]erving a subpoena requires delivering a copy to the named person." No such copy was delivered directly to Wagner. Instead, it was mailed via FedEx to a business address for Wagner Aeronautical, Inc. (See Exhibit 1, p. 4.) Therefore, service was deficient.

## IV.

## CONCLUSION

Lance seeks to put a stop to Tom Ricotta's revenge mission through the FAA. As described above, the subpoena is improperly vague, overbroad, irrelevant, oppressive, and was improperly served. Lance therefore respectfully requests the subpoena be quashed.

Dated: May 26, 2022

_____
Christopher S. Morris, Esq.
Jacob A. Gillick
Attorney for Petitioner Lance Ricotta

8

## **CERTIFICATE OF SERVICE**

I do hereby certify that the foregoing Motion to Quash Subpoena for Deposition of Mr. William Wagner regarding In The Matter of The Safety Investigation Related to Lance Ricotta, has been sent this date by Email and Federal Express delivery to:

Cynthia A. Dominik, Assistant Chief Counsel for Enforcement
Brian Kahn, Esq.
Federal Aviation Administration
Enforcement Division, Midwest Team
AGC-300, Room 917M
800 Independence Avenue SW
Washington, D.C. 20591

Dated: May 26, 2022

*Leanna Pierce*
_____

Leanna Pierce, Legal Assistant
Morris Law Firm, APC

033

# EXHIBIT 1





U.S. Department
of Transportation

**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Midwest Team

## VIA FED-EX OVERNIGHT MAIL

March 15, 2022

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

**Re:    IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO LANCE
RICOTTA.**

Dear Mr. Wagner:

Attached is a subpoena for deposition. This deposition is necessary as part of the Federal
Aviation Administration's investigation relating to the above-captioned matter. Specifically the
FAA investigation is related to alleged flight operations conducted by Lance Ricotta while Mr.
Ricotta may have been required to hold an air carrier certificate in order to conduct such
operations.

Standard Form 1157, Claim for Witness Attendance Fees, Travel, and Miscellaneous Expenses
and Instructions to Witness, is enclosed. Please complete the Standard Form 1157 after the
deposition, and return it to this office within one week of the completion of the deposition. If you
have any questions regarding reimbursable expenses or the completion of this form, please
contact the undersigned attorney.

Upon your receipt of this subpoena, please contact the undersigned attorney to discuss this
matter.

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

By: **BRIAN K KHAN**   Digitally signed by
BRIAN K KHAN
Date: 2022.03.16
13:44:56 -04'00'

Brian K. Khan, Esq.
Enforcement Division, Midwest Team
AGC-300, Room 917M
800 Independence Avenue SW
Washington, D.C. 20591
T: 202-267-4771
F: 202-267-5106
E: brian.k.khan@faa.gov

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**FEDERAL AVIATION ADMINISTRATION**
**OFFICE OF THE CHIEF COUNSEL**
**ENFORCEMENT DIVISION**

**IN THE MATTER OF THE SAFETY**
**INVESTIGATION RELATING TO LANCE**
**RICOTTA.**

**SUBPOENA FOR DEPOSITION**

TO:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

At the instance of the Federal Aviation Administration (FAA), you are hereby required to appe
before a person having the power to administer oaths, at the date, time and place specified bel
and to give testimony under oath pertinent to the subject investigation. Specifically, the FAA
depose you regarding transportation by air provided to you by Lance Ricotta.

## DATE AND TIME FOR TAKING OF DEPOSITION:

Date: April 7, 2022
Time: 2:00 P.M. Pacific Daylight Time

## PLACE FOR TAKING OF DEPOSITION:

This deposition will take place at:

San Diego Flight Standards District Office
Montgomery-Gibbs Executive Airport
8525 Gibbs Drive
San Diego, CA 92123

037

## AUTHORITY

This subpoena is issued pursuant to the provisions of 14 Code of Federal Regulations (C.F.R.) Section 13.3, is authorized under the provisions of 49 United States Code (U.S.C.) Sections 40113(a), 46101, 46104, 46313, and is judicially enforceable under 49 U.S.C. Section 46104(b)

You are required to attend and to testify at this deposition at the appointed time. Moreover, refusal to comply with this subpoena may result in criminal prosecution pursuant to 49 U.S.C. Section 46313.

The undersigned, an officer designated by the Administrator of the Federal Aviation Administration, executed this subpoena in Washington, D.C., this 15th day of March 2022.

CYNTHIA A     Digitally signed by
DOMINIK       CYNTHIA A DOMINIK
              Date: 2022.03.15 14:39:24
              -04'00'

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Subpoena for Deposition regarding In The Matter Of The Safety Investigation Relating To Lance Ricotta, has been sent this date by FedEx – overnight delivery to:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025


Dated:      **MAR 1 6 2022**


Jeff Kamberg, Management and Program Analyst
Enforcement Division-Western Team
National Enforcement Program
Federal Aviation Administration
Des Moines, Washington

# EXHIBIT 2

1   Christopher S. Morris, SBN 16188
    cmorris@morrislawfirmapc.com
2   Byron K. Husted SBN 281431
    byron@morrislawfirmapc.com
3   MORRIS LAW FIRM, APC
    501 West Broadway, Suite 1480
4   San Diego, CA 92101
    Telephone: (619) 826-8060
5   Facsimile: (619) 826-8065

6   Attorneys for Lance Z. Ricotta

7

FILED
PROBATE DIVISION

2018 NOV 20   PM 12: 19

CLERK-SUPERIOR COURT
SAN DIEGO COUNTY, CA

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                           COUNTY OF SAN DIEGO

10

11   In re:                              Case No.   37-2018-00058591-PR-TR-CTL

12   THE ETL TRUST, UDT 3/30/2005        ROA # 1

13                                       **PETITION FOR ORDER TO COMPEL
                                         TRUSTEE TO ACCOUNT, MAKE**
14                                       **DISTRIBUTIONS, AND TEMPORARY
                                         SUSPENSION**
15
                                         [Prob. Code §§17200, 16063]
16
                                         Date:
17                                       Time:
                                         Dept.:
18                                       Judge:

19

20        Petitioner Lance Z. Ricotta ("Petitioner"), as fifty percent (50%) beneficiary of the ETL

21   Trust, dated March 30, 2005 ("ETL Trust"), hereby petitions the Court For (1) Order to Compel

22   Trustee to Account, (2) Order to Compel Trustee to Distribute Assets, and (3) Temporary

23   Suspension, as follows:

24                                          **I.**

25                                      **STANDING**

26        1.    Petitioner has standing to bring this petition as the son of the deceased Grantor of

27   the ETL Trust, Ellen A. Ricotta ("Mrs. Ricotta"), and under Cal. Prob. Code Section 17200 as

28   beneficiary of the ETL Trust.

                                            1
                        PETITION FOR ACCOUNTING AND SUSPENSION

## II.

## JURISDICTION AND VENUE

2.     Jurisdiction and Venue is proper in San Diego County because the principle place of administration of the ETL Trust is located in San Diego County, California.

## III.

## INTRODUCTION

3.     Petitioner is owed approximately $13,000,000 to $15,000,000 in distributions from the ETL Trust (not including damages against the trustee). Respondent and Trustee, Thomas D. Ricotta ("Respondent"), Petitioner's brother, refuses to provide a trust accounting and make distributions. Petitioner is entitled to a full accounting from 2010 to present date in order to assess his damages against the Respondent for breach of trust.

## IV.

## STATEMENT OF FACTS

### A.     FAMILY HISTORY

4.     Petitioner and Respondent are Mrs. Ricotta's only children. At the start of 2005, Mrs. Ricotta was a single mom assisting Petitioner hold ownership of and run a company Petitioner started (the "Business"). For various reasons, Petitioner had allowed his mother to take over ownership to assist him with management.

5.     In order to help Respondent, Petitioner agreed to gift ten percent ownership of the Business to Respondent and hired him to also help run the Business.

6.     Unfortunately, at the end of 2006 Mrs. Ricotta was being treated for Lyme's disease along with a multitude of other illnesses. As a result, Respondent stepped in and took over the management of Mrs. Ricotta's finances. Starting in 2005, Petitioner is informed and believes that Respondent became concerned about his mother's health and convinced her to set up a trust (the "ETL Trust").

7.     Even though Petitioner alone had started the Business, Petitioner is informed and believes that Respondent convinced Mrs. Ricotta to transfer ownership of it into the ETL Trust.

///

2

8.     Mrs. Ricotta executed the ETL Trust and transferred ninety percent ownership of the Business into it on March 30, 2005. (See ETL Trust[1].) However, it was always understood that the company was started by Petitioner, and belonged to Petitioner.

9.     Under Article IV, subsection C., Mrs. Ricotta instructed that upon her death the stocks of the Business be "distributed to each son in such a way so that each son will ultimately own equal shares of the corporate stock." She then indicated that, "Thomas Daniel Ricotta, Jr.[Respondent] owns ten (10) shares." Even though Petitioner did not agree with or consent to the ownership of the Business in his mother's trust, he did not want to cause any family discord and chose not to object.

10.     On information and belief, from 2006 forward, Respondent handled Mrs. Ricotta's estate, wrote all her checks, and eventually let her house go into foreclosure. However, the next ten years brought untold success and growth to the Business. Mrs. Ricotta maintained a strong relationship with both her sons during this time. She also maintained that she wanted to make sure that both her sons were equal owners of the Business after she passed.

11.     Then, on December 27, 2006, Mrs. Ricotta was brought into Kaiser Permanente for, among other things, "memory loss" and "confusion." She was diagnosed with the following terminal brain issues:

- Marked vasogenic edema with left temporal lobe and corpus callosum marked mass effect;
- Subfalcine and incisural herniation of marked degree with low cerebellar tonsils.
- Multiple meningiomas;
- Right lateral ventricular flow obstruction;
- Abnormal brainstem signals; and
- Possible metastasis and Cerebral lymphoma.

///

///

[1] The ETL Trust is submitted confidentially per SDSC Local Rule 4.3.3.J and submitted herewith.

12.     Within a week Mrs. Ricotta went through major brain surgery.  It was noted in her medical records that after surgery she had significant diminishment in her mental capacity.

13.     Within days of the start of her long and difficult recovery, on January 29, 2007, Respondent clandestinely orchestrated the creation of the First Amendment to the ETL Trust, which manipulated the distribution provisions of the ETL Trust into making sure that upon Mrs. Ricotta's death Respondent would appear to own fifty-five percent of the Business and Petitioner would only own forty-five percent.  See First Amendment to the ETL Trust[2].

14.     On information and belief, Mrs. Ricotta did not execute the First Amendment. And if she did, she could not understand the documents, or their affects on her estate plan. Petitioner had no knowledge of the First Amendment, either before or after his mother's death.

**B.     ETL TRUST ADMINISTRATION**

15.     Mrs. Ricotta never fully recovered from her brain surgery and passed away in 2009.  Respondent took over management of the ETL Trust at that time.  Respondent never informed Petitioner that there was a First Amendment.  Respondent never indicated that he believed Petitioner only had a right to forty-five percent of the assets the ETL Trust.

16.     Rather, for the last seven years, Respondent represented to Petitioner that they had equal rights to the assets of the ETL Trust, including equal ownership interest in the business, and Respondent was only holding the Business in the ETL Trust for Petitioner's benefit.  Further, Respondent continually represented to Petitioner that the distributions of net income between them from the date of their mother's death to current date were always an equal fifty-fifty between them.

17.     Now that Petitioner wants his shares distributed in accordance with the terms of the ETL Trust, Petitioner has demanded that Respondent provide a full accounting of the ETL Trust and make the appropriate distribution.  Respondent not only refuses to provide an accounting, but also refuses to distribute Petitioner's share of the ETL Trust.  **As the ETL Trust**

///

---

[2] The First Amendment to the ETL Trust is submitted confidentially per SDSC Local Rule 4.3.3.J and submitted herewith

1  and Business should be worth over $35,000,000 million, Petitioner's concern for an
2  accounting and for his distribution is well warranted.

3       18.    After some investigation and review of the Business records, on information and
4  belief there appears to be over $5,000,000 dollars missing or misappropriated by Respondent.

5       19.    To try and cover up his malfeasance, Respondent is now trying to sell the Business
6  out from under Petitioner. Petitioner has sent several cease and desist letters demanding that
7  Respondent not sell Petitioner's shares, provide an accounting, and distribute Petitioner's shares.
8  Respondent refuses to comply.

9                              **CAUSES OF ACTION**

10       **PETITION FOR ORDER (1) TO COMPEL TRUSTEE TO ACCOUNT, (2) TO**
11      **DISTRIBUTE PETITIONER'S SHARES, AND (3) SUSPEND AND ENJOIN**
12          **RESPONDENT TRUSTEE FROM SELLING TRUST ASSETS**
13          **(Prob. Code, §§ 15642, 16420, 16003, 17206 &17200(b)(7))**

14       20.    Petitioner incorporates and alleges all the foregoing allegations as though fully set
15  fourth herein. A successor trustee is under a duty to deal impartially with any beneficiary and to
16  act only for their benefit. (See Prob. Code § 16003.)

17       21.    A trustee is bound to act in the highest good faith towards the beneficiary and may
18  not obtain any advantage by the slightest misrepresentation, concealment, threat, or adverse
19  pressure of any kind. (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 257.) A Breach of trust is a
20  violation by the trustee of any duty that the trustee owes a beneficiary. (See Prob. Code § 16400.)
21  Furthermore, a trustee may be suspended at any time if a Court deems appropriate and necessary
22  to protect the assets. (Prob. Code § 15642.)

23       22.    Since before Mrs. Ricotta's death, Respondent has taken control over the
24  management of the ETL Trust. It has been over seven years from Mrs. Ricotta's death and
25  Respondent still refuses to provide an accounting of the ETL Trust, or distribute Petitioner's fifty
26  percent interest in the business in accordance with the terms of the ETL Trust.

27       23.    Further, Petitioner believes that Respondent has also concealed that he has been
28  misappropriating millions of dollars in income from the ETL Trust for his sole benefit.

1   Respondent's plan to bury his misdeeds is to try and sell the ETL Trust assets and business away

2   from Petitioner and force Petitioner to take a cash settlement.  Petitioner wants his share of the

3   business and will not agree to sell it.

4        24.   Respondent must not be allowed to continue his dishonest administration of the

5   ETL Trust.  Petitioner requests an immediate order (1) for Respondent to file a full accounting

6   under California Probate Code section 16063 from February 1, 2007, to current date, (2)

7   enjoining Respondent from selling any assets belonging to the ETL Trust, or that Respondent

8   wrongfully took from Mrs. Ricotta and the ETL Trust, (3) suspending Respondent as successor

9   trustee of the ETL Trust, and (4) appointment of Petitioner as successor trustee.  If the Court

10  prefers, Petitioner will select and a third party independent fiduciary to step in as interim trustee.

11       25.   After the accounting is provided, Petitioner will seek further damages, return of

12  misappropriated assets, and surcharge, if necessary.

13       26.   The names, addresses, and relationships of all interested persons and beneficiaries

14  named in ETL Trust, so far as they are known or reasonably ascertainable by Petitioner, are as

15  follows:

16

| Name & Address | Relationship |
|---|---|
| Thomas Ricotta<br>2982 Night Watch Way<br>Alpine, CA 91901 | Trustee and Beneficiary |

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

PETITION FOR ACCOUNTING AND SUSPENSION

046

1   **Wherefore, Petitioner Respectfully Prays for the Following:**

2   1.  Order for Tom Ricotta to file an accounting with this Court under California Probate

3       Code section 16063 from February 1, 2007, to present date;

4   2.  Order enjoining Tom Ricotta from selling any asset or business belonging to the ETL

5       Trust;

6   3.  Order for Tom Ricotta to distribute Lance Ricotta's share of the ETL Trust;

7   4.  Order Suspending Tom Ricotta as Successor Trustee of the ETL Trust;

8   5.  Order appointing an interim trustee;

9   6.  For cost of suit and attorney's fees herein;

10                                          Respectfully submitted,

11                                          **MORRIS LAW FIRM, APC**

12

13  Dated: November 20, 2018          By:

14                                          Christopher S. Morris, Esq.
                                            Byron K. Husted, Esq.
15                                          Attorneys for Petitioner Lance Z. Ricotta

16

17

18

19

20

21

22

23

24

25

26

27

28

PETITION FOR ACCOUNTING AND SUSPENSION

## Verification

I, Lance Ricotta am the Petitioner in the above-entitled proceedings. I have read the foregoing Petition For Accounting and Suspension. The matters alleged in the Petition are true based on my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this verification was executed on November____13___, 2018 at _____San Marcos_____, California.

*Lance Ricotta*

Lance Ricotta

PETITION FOR ACCOUNTING AND SUSPENSION

048

# EXHIBIT 3

Superior Court of California
County of San Diego

In re:                              )
                                    )
The ETL Trust, UDT 3/30/2005        )
                                    )
                                    )
_____   )
                                    )
Lance Ricotta, an individual,       )
                                    )
              Petitioner,           )     37-2018-00058591
      v.                            )     PR-TR-CTL
                                    )
Thomas Ricotta, an individual       )
and Successor Trustee of the        )
ETL Trust UDT 3/30/2005;            )
Barry Fefferman, an individual;     )
Joan Walsh, an individual;          )
and Does 1-50,                      )
                                    )
              Respondents.          )
_____   )


Video Deposition of CYNTHIA ELIZABETH SPIER, M.D.
San Diego, California
Tuesday, March 10, 2020


Reported by:
Veronica S. Thompson
CSR 6056, RPR, CRR, CCRR
Shelburne Sherr Job 100144

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:39:02 | 1 | morning trying to recall Ellen, but I don't have the -- |
| 12:39:09 | 2 | I didn't have the paper chart that preceded our |
| 12:39:12 | 3 | electronic medical record. |
| 12:39:13 | 4 | Q.   Great.  Well, I'm going to help you hopefully |
| 12:39:16 | 5 | refresh some of your recollection and just maybe ask you |
| 12:39:18 | 6 | to interpret some of the charts that are kind of key to |
| 12:39:21 | 7 | this case.  Okay? |
| 12:39:21 | 8 | A.   Okay. |
| 12:39:23 | 9 | Q.   And one of the key terms I want to make sure |
| 12:39:25 | 10 | that everybody sort of understands, is on the same page |
| 12:39:29 | 11 | with, is the term "severe aphasia," and that's kind of |
| 12:39:34 | 12 | one of the key terms in this case, and we'll go ahead |
| 12:39:36 | 13 | and mark this as Exhibit 1, if we could.  This is the |
| 12:39:49 | 14 | trusty source of WebMD. |
| | 15 | (Exhibit 1 was marked for identification.) |
| | 16 | BY MR. MORRIS: |
| | 17 | Q.   So -- |
| 12:39:54 | 18 | A.   Could I interrupt you -- |
| 12:39:55 | 19 | Q.   Certainly. |
| 12:39:55 | 20 | A.   -- and just say it's pronounced aphasia, but |
| 12:39:58 | 21 | that's -- |
| 12:39:59 | 22 | Q.   Perfect. |
| 12:39:59 | 23 | A.   Aphasia. |
| 12:40:01 | 24 | Q.   And I would have absolutely no problem with |
| 12:40:03 | 25 | you correcting any of my -- |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:40:06 | 1 | A. Okay. |
| 12:40:06 | 2 | Q. -- nomenclature. Okay? Thank you. |
| 12:40:07 | 3 | So there's expressive aphasia, which -- |
| 12:40:12 | 4 | laymen's terms means just difficulty speaking. Fair? |
| 12:40:16 | 5 | A. Fair. |
| 12:40:16 | 6 | Q. Receptive: difficulty understanding? |
| 12:40:20 | 7 | A. Correct. |
| 12:40:20 | 8 | Q. And then if you turn the page, there's a |
| 12:40:24 | 9 | paragraph that lays out the difference between aphasia |
| 12:40:29 | 10 | and severe aphasia. And it's right under -- see where |
| 12:40:33 | 11 | it says "What are the symptoms" and then there's a -- |
| 12:40:36 | 12 | A. Uh-huh. |
| 12:40:36 | 13 | Q. Oh, excuse me. |
| 12:40:37 | 14 | A. Yes. |
| 12:40:38 | 15 | Q. Right under "Primary progressive" at the |
| 12:40:41 | 16 | top -- |
| 12:40:41 | 17 | A. Yes. |
| 12:40:41 | 18 | Q. -- it says, "Aphasia may be mild or severe." |
| 12:40:43 | 19 | Do you see that? |
| 12:40:43 | 20 | A. Yes. |
| 12:40:44 | 21 | Q. It says, "Severe aphasia limits the person's |
| 12:40:48 | 22 | ability to communicate. The person may say little. |
| 12:40:51 | 23 | They may not participate in or understand any |
| 12:40:54 | 24 | conversation." |
| 12:40:55 | 25 | Can we go ahead and, for purposes of this |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:40:57 | 1 | deposition, use that definition for severe aphasia? |
| 12:41:01 | 2 | A.   I -- I might not be that strict.  I might have |
| 12:41:06 | 3 | called Ellen to have severe aphasia, and it might not |
| 12:41:11 | 4 | have been -- what you have to notice in here, this |
| 12:41:16 | 5 | definition -- it says, "may say little and may not |
| 12:41:20 | 6 | participate in or understand any conversation."  It |
| 12:41:24 | 7 | doesn't mean they don't. |
| 12:41:26 | 8 | Q.   Okay. |
| 12:41:26 | 9 | A.   Okay?  And so severe can be limited, very |
| 12:41:31 | 10 | limited, but it doesn't mean that they don't understand |
| 12:41:35 | 11 | any conversation -- |
| 12:41:36 | 12 | Q.   Okay. |
| 12:41:37 | 13 | A.   -- so I just want you to be aware of that. |
| 12:41:40 | 14 | Q.   Sure.  So when you use the term "severe |
| 12:41:43 | 15 | aphasia" in your everyday interaction and charting, |
| 12:41:48 | 16 | would you adopt sort of this definition which is "may |
| 12:41:54 | 17 | not participate" or has very limited -- what -- |
| 12:42:00 | 18 | A.   I would say -- |
| 12:42:00 | 19 | Q.   I guess I'm confused by your -- by your |
| 12:42:02 | 20 | clarification. |
| 12:42:03 | 21 | A.   Okay.  I would probably -- be better if I |
| 12:42:06 | 22 | described what they could do in the chart, and there may |
| 12:42:10 | 23 | be notes that I don't because I felt that I did it |
| 12:42:14 | 24 | beforehand. |
| 12:42:16 | 25 | So if I wrote in the chart "severe aphasia" |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:42:19 | 1 | and I didn't write any tasks that I did, like followed a |
| 12:42:23 | 2 | three-step, followed a two-step, followed a one-step |
| 12:42:28 | 3 | command -- if I didn't write anything, it may have been |
| 12:42:32 | 4 | because I did it on a previous visit.  Okay?  But |
| 12:42:36 | 5 | there's a range of severe. |
| 12:42:39 | 6 | Q.   Sure. |
| 12:42:40 | 7 | A.   It just means they're pretty limited. |
| 12:42:42 | 8 | Q.   Okay.  So we go with -- I think you -- earlier |
| 12:42:45 | 9 | testimony was it could mean they cannot participate or |
| 12:42:49 | 10 | understand or very limited ability to participate or |
| 12:42:52 | 11 | understand.  Go with that definition? |
| 12:42:57 | 12 | MR. ABBOTT:  Misstates her testimony. |
| 12:42:58 | 13 | THE WITNESS:  I -- I just want to say that in |
| 12:43:00 | 14 | this case I don't want to be pinned down to a |
| 12:43:04 | 15 | definition.  I would rather be based on what I have |
| 12:43:08 | 16 | written in the chart and the objective findings and |
| 12:43:12 | 17 | notes but, in general, yes. |
| 12:43:15 | 18 | BY MR. MORRIS: |
| 12:43:15 | 19 | Q.   Okay.  Perfect.  And I don't blame you at all |
| 12:43:19 | 20 | for wanting to refer to your charts. |
| 12:43:22 | 21 | (To court reporter)  So maybe you can just |
| 12:43:24 | 22 | hand me the -- |
| | 23 | (Discussion off the record.) |
| | 24 | (Exhibit 2 was marked for identification.) |
| | 25 | /// |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:57:17 | 1 | 70 percent correct. |
| 12:57:19 | 2 | Q.   Then your objective diagnosis there is, |
| 12:57:22 | 3 | severe, underline, receptive and expressive aphasia? |
| 12:57:26 | 4 | A.   Right.  And you can see that she -- she wasn't |
| 12:57:29 | 5 | able to name objects either.  She -- |
| 12:57:33 | 6 | Q.   What -- |
| 12:57:34 | 7 | A.   She called -- |
| 12:57:34 | 8 | Q.   Oh. |
| 12:57:34 | 9 | A.   -- the -- she said "jack" for jacket. |
| 12:57:38 | 10 | And then, underneath that, she was able to |
| 12:57:41 | 11 | repeat a simple sentence. |
| 12:57:43 | 12 | And then my -- my impression is that she did |
| 12:57:48 | 13 | have a severe -- and this is a severe -- |
| 12:57:50 | 14 | receptive/expressive aphasia. |
| 12:57:54 | 15 | Q.   And in this context severe receptive means she |
| 12:57:57 | 16 | can't understand or a very limited understanding of the |
| 12:58:00 | 17 | words that were being said? |
| 12:58:01 | 18 | A.   She had very limited -- if you -- if you are |
| 12:58:05 | 19 | getting 50 percent of a simple yes-and-no question, |
| 12:58:11 | 20 | that's basically guessing.  That's what you would get if |
| 12:58:15 | 21 | you were guessing. |
| 12:58:16 | 22 | And people with aphasia -- another thing |
| 12:58:19 | 23 | that's really important to understand about aphasia that |
| 12:58:22 | 24 | a lot of people don't know is that the right hemisphere, |
| 12:58:29 | 25 | the one that's intact, is the one that processes our |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| 12:58:33 | 1 | intonation. |
| 12:58:35 | 2 | So you could understand by my intonation that |
| 12:58:39 | 3 | I was asking you a question, and you might answer yes or |
| 12:58:42 | 4 | no or nod your head yes or no, but the words would be, |
| 12:58:46 | 5 | like, totally you wouldn't understand anything. |
| 12:58:51 | 6 | Q.   Gotcha. |
| 12:58:51 | 7 | A.   So a lot of times families will think that |
| 12:58:56 | 8 | their family member understands a lot more than they do |
| 12:59:00 | 9 | because the patient responds to the intonation.  Also, a |
| 12:59:08 | 10 | lot of times families will gesture.  They'll say |
| 12:59:12 | 11 | something like, "Lift your arm up, Mom.  Come on."  And |
| 12:59:17 | 12 | then mom will lift the arm up, and then they think that |
| 12:59:20 | 13 | she's understanding.  Or they'll say, "Look who's here: |
| 12:59:24 | 14 | Bobby.  Aren't you happy to see him?" |
| 12:59:27 | 15 | Q.   And they'll just -- |
| 12:59:28 | 16 | A.   And then -- "yes."  And, you know, it's the |
| 12:59:30 | 17 | intonation that tells you it's a question. |
| 12:59:34 | 18 | Q.   And that's controlled by the right -- |
| 12:59:36 | 19 | A.   So when I -- |
| 12:59:36 | 20 | Q.   Yeah. |
| 12:59:36 | 21 | A.   When I see 50 percent on a simple yes-or-no |
| 12:59:43 | 22 | question -- and I'm talking simple yes-or-no question, |
| 12:59:45 | 23 | like "Is it raining?  Is it nighttime?  Do you live in |
| 12:59:50 | 24 | Chicago?  Do you live in San Diego?"  Those are the |
| 12:59:53 | 25 | kinds of things I personally would be asking on a simple |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:59:57 | 1 | yes-or-no. |
| 12:59:58 | 2 | When I see 50 percent, simple yes/no, I know |
| 01:00:01 | 3 | right now, looking at this note, that she had a severe |
| 01:00:06 | 4 | receptive impairment. |
| 01:00:09 | 5 | Q.   50 percent is basically a guess? |
| 01:00:11 | 6 | A.   You can get 50 percent with guessing. |
| 01:00:14 | 7 | Q.   And I know that from my high school true/false |
| 01:00:17 | 8 | questions. |
| 01:00:23 | 9 | And from the fact that she -- if we can go |
| 01:00:27 | 10 | back to that definition where there's, you know, very |
| 01:00:30 | 11 | limited or no understanding on the receptive phase -- I |
| 01:00:35 | 12 | mean, can you say defin- -- can you say that she wasn't |
| 01:00:39 | 13 | understanding anything or -- or -- |
| 01:00:40 | 14 | A.   No.  She's -- |
| 01:00:40 | 15 | Q.   -- just very, very limited? |
| 01:00:42 | 16 | A.   She's understanding some things.  She could |
| 01:00:44 | 17 | follow simple commands with 70 percent accuracy; so she |
| 01:00:49 | 18 | was getting some things, but she wasn't getting all of |
| 01:00:56 | 19 | it. |
| 01:00:57 | 20 | Q.   Gotcha. |
| 01:00:58 | 21 | A.   And, again, a simple command is something like |
| 01:01:01 | 22 | "Close your eyes.  Open your mouth.  Stick out your |
| 01:01:05 | 23 | tongue."  That's a simple command. |
| 01:01:07 | 24 | Q.   Getting 70 percent of that right would |
| 01:01:10 | 25 | indicate to you a severe receptive dis- -- inability? |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

01:01:15  1      A.    Yeah, yeah.  She -- by the whole exam, you can
01:01:16  2   say she was severely impaired.
01:01:20  3      Q.    Is this a -- is this a mental -- like a
01:01:22  4   mini-mental exam?
01:01:23  5      A.    No.
01:01:23  6      Q.    I see that in --
01:01:24  7            What is a mini-mental exam?
01:01:26  8      A.    A mini-mental -- a mini-mental exam looks
01:01:31  9   for -- is a screening tool for dementia.
01:01:34 10            And I want to explain something to you,
01:01:37 11   everyone.
01:01:40 12            Before I went to medical school, I was a
01:01:42 13   speech-language pathologist.  I have a master's degree
01:01:45 14   in speech and hearing; so I know aphasia very well.  And
01:01:50 15   I know it more than the other colleagues, and that's why
01:01:55 16   their terminology might not be very specific.
01:02:00 17      Q.    Uh-huh.
01:02:00 18      A.    Okay?
01:02:01 19            So I know exactly what I was doing here.  I
01:02:07 20   practiced speech pathology for ten years before I went
01:02:10 21   to med school and became a neurologist.
01:02:14 22            So this gal had a severe receptive/expressive
01:02:18 23   aphasia, and you can't make comments about her mentation
01:02:24 24   like memory and things like that.  You can't assess it.
01:02:27 25   When somebody has a severe language deficit, you can't

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:12:19 | 1 | gotten any better? |
| 01:12:20 | 2 | MR. ABBOTT:   Same objection.   Asked and |
| 01:12:22 | 3 | answered now. |
| 01:12:24 | 4 | BY MR. MORRIS: |
| 01:12:24 | 5 | Q.    You can answer. |
| 01:12:25 | 6 | A.    Can I answer it? |
| 01:12:26 | 7 | Q.    Yeah. |
| 01:12:27 | 8 | A.    Okay.   It doesn't appear that she's gotten any |
| 01:12:29 | 9 | better with her language skills. |
| 01:12:33 | 10 | Q.    And it would be outside the norm and outside |
| 01:12:37 | 11 | any medical literature that I find that she would |
| 01:12:39 | 12 | have -- in between this 1/12 and 1/22 to have, like, you |
| 01:12:43 | 13 | know, windows of lucidity. |
| 01:12:45 | 14 | A.    She would not. |
| 01:12:57 | 15 | Q.    And, if you can tell me, would a person in |
| 01:13:00 | 16 | this condition be able to read, comprehend |
| 01:13:04 | 17 | comprehensive, complex, detailed legal documents? |
| 01:13:08 | 18 | MR. ABBOTT:   Objection.   Lack of foundation, |
| 01:13:10 | 19 | vague as to time. |
| 01:13:14 | 20 | Let's not try to trap the good doctor into a |
| 01:13:17 | 21 | forensic opinion, Counsel. |
| 01:13:18 | 22 | BY MR. MORRIS: |
| 01:13:18 | 23 | Q.    You can answer. |
| 01:13:19 | 24 | A.    Well, I think, you know, I would say that I |
| 01:13:22 | 25 | can make a comment on that because she's got a severe |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:13:28 | 1 | receptive aphasia.  And reception is listening and |
| 01:13:33 | 2 | reading.  So reading something is the same as listening. |
| 01:13:39 | 3 | They're both words. |
| 01:13:40 | 4 | And she's only processing -- she's only |
| 01:13:45 | 5 | following very simple commands such as, you know, |
| 01:13:50 | 6 | stick -- even with very simple things like "Close your |
| 01:13:54 | 7 | eyes" and "Stick out your tongue," she gets 70 percent |
| 01:13:57 | 8 | correct.  So she's even missing something really simple. |
| 01:14:02 | 9 | You would not expect somebody with that degree |
| 01:14:05 | 10 | of receptive involvement to understand a couple of |
| 01:14:10 | 11 | sentences even. |
| 01:14:13 | 12 | Q.   Thank you. |
| | 13 | (Exhibit 8 was marked for identification.) |
| 01:14:22 | 14 | BY MR. MORRIS: |
| 01:14:23 | 15 | Q.   And then I have this note.  We'll mark this as |
| 01:14:26 | 16 | Exhibit 8, but it's pretty much the same note, just in a |
| 01:14:28 | 17 | different format.  And I was just confused as to why -- |
| 01:14:31 | 18 | I mean, it is almost word for word the same note, but it |
| 01:14:36 | 19 | just shows up twice in a different format.  Maybe you |
| 01:14:39 | 20 | could help explain that. |
| 01:14:42 | 21 | MS. BURD:  Do you have copies? |
| 01:14:43 | 22 | MR. MORRIS:  Oh, I'm sorry. |
| 01:14:44 | 23 | THE WITNESS:  This is the same note.  This is |
| 01:14:45 | 24 | the same note.  One -- it's -- |
| 01:14:50 | 25 | /// |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:26:40 | 1 | BY MR. MORRIS: |
| 01:26:40 | 2 | Q.   So the question that I -- you can see that |
| 01:26:42 | 3 | these are sort of complex legal documents. |
| 01:26:45 | 4 | A.   Uh-huh, yes. |
| 01:26:47 | 5 | Q.   And these were allegedly signed by |
| 01:26:51 | 6 | Miss Ricotta on January 29, 2007. |
| 01:26:58 | 7 | Now, given the condition of her left lobe and |
| 01:27:00 | 8 | that she's right-handed, would you have expected |
| 01:27:03 | 9 | Miss Ricotta to be able to physically actually sign |
| 01:27:06 | 10 | something in January 29, '07, or can you tell? |
| 01:27:15 | 11 | MR. ABBOTT:  Lack of foundation. |
| 01:27:18 | 12 | THE WITNESS:  I don't have any -- I didn't |
| 01:27:20 | 13 | assess her writing in my exam.  There's no documentation |
| 01:27:28 | 14 | that I asked her to sign her name. |
| 01:27:31 | 15 | But I will say that a signature is -- is |
| 01:27:37 | 16 | something that's almost automatic because it's something |
| 01:27:41 | 17 | that you do in your life over and over and over and over |
| 01:27:45 | 18 | again.  So it's possible that someone with severe |
| 01:27:51 | 19 | aphasia could sign their name. |
| 01:27:52 | 20 | MR. MORRIS:  Fair enough. |
| 01:27:53 | 21 | BY MR. MORRIS: |
| 01:27:53 | 22 | Q.   And based on the fact that on January 22, |
| 01:27:55 | 23 | 2007, you had diagnosed her with severe receptive and |
| 01:28:01 | 24 | expressive aphasia, can you help us maybe inform or |
| 01:28:04 | 25 | render an opinion as to what the likelihood that she |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

01:28:07  1   would have been able to read, comprehend, and understand

01:28:10  2   these complex legal documents on January 29, 2007?

01:28:14  3           MR. ABBOTT:  Lack of foundation.

01:28:16  4           THE WITNESS:  I don't -- I don't see how she

01:28:18  5   would have been able to comprehend this -- document

01:28:22  6   number 11.

01:28:24  7   BY MR. MORRIS:

01:28:25  8       Q.   Great.  I still have seven minutes left, so I

01:28:28  9   would like to go back and do what I typically would have

01:28:32 10   done in the beginning, which is go over some of your

01:28:34 11   history and experience and education.

01:28:40 12           Tell us -- you said you had a -- you were a

01:28:44 13   speech pathologist before this?

01:28:46 14       A.   Yes.

01:28:46 15       Q.   Can you tell us where and -- and your

01:28:47 16   experience with that.

01:28:48 17       A.   Well, I graduated with a undergraduate at

01:28:51 18   UC Santa Barbara, and then --

01:28:54 19       Q.   Gaucho.

01:28:55 20       A.   -- I -- yes, Gaucho.

01:28:58 21           -- and then I got a master's in speech

01:29:01 22   pathology at the University of Arizona in Tucson.  And

01:29:06 23   then I practiced for ten years in a hospital setting.

01:29:13 24       Q.   So funny.  I just had a Kaiser case with a

01:29:17 25   spinal surgery, and the person who was doing the neuro

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| 01:29:20 | 1 | monitoring was -- her background was speech pathology. |
| 01:29:23 | 2 | Did you do, like, neuro monitoring, or was |
| 01:29:26 | 3 | it -- |
| 01:29:26 | 4 | A.   No, I didn't do that. |
| 01:29:27 | 5 | Q.   And then after ten years of speech pathology |
| 01:29:30 | 6 | in a hospital -- |
| 01:29:31 | 7 | A.   Then I decided I wanted to become a |
| 01:29:34 | 8 | neurologist.  So I took all the premed classes and |
| 01:29:38 | 9 | applied to med school, and I went to the University of |
| 01:29:41 | 10 | Arizona in Tucson. |
| 01:29:43 | 11 | Q.   And upon graduating -- |
| 01:29:46 | 12 | A.   I did my intern year in Long Beach, and I did |
| 01:29:51 | 13 | my neurology residency at UC San Diego. |
| 01:30:00 | 14 | Q.   I went to UC San Diego, but, you know, we |
| 01:30:03 | 15 | lawyers went to Warren; we didn't go to Revelle.  I |
| 01:30:07 | 16 | imagine you went to Revelle? |
| 01:30:08 | 17 | A.   It was residency, so -- |
| 01:30:10 | 18 | Q.   Oh, that's right. |
| 01:30:10 | 19 | A.   -- it had nothing to do with the college. |
| 01:30:13 | 20 | Q.   And then where have you practiced after |
| 01:30:15 | 21 | leaving your residency? |
| 01:30:16 | 22 | A.   And I've practiced since then at Kaiser -- |
| 01:30:20 | 23 | Q.   Kaiser the whole time? |
| 01:30:21 | 24 | A.   -- right here. |
| 01:30:22 | 25 | Yes. |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:44:17 | 1 | fine.  Barry said he was in and out. |
| 01:44:21 | 2 | BY MR. ABBOTT: |
| 01:44:21 | 3 | Q.    And all of that took place at Stanford Court, |
| 01:44:23 | 4 | the nursing facility -- skilled nursing facility in |
| 01:44:26 | 5 | Santee. |
| 01:44:27 | 6 | A.    Okay. |
| 01:44:30 | 7 | Q.    I want to harken back for a minute to your |
| 01:44:33 | 8 | testimony about how a person suffering from some form of |
| 01:44:40 | 9 | aphasia could be reacting to the tone of a question in |
| 01:44:49 | 10 | signaling agreement or disagreement even if they're |
| 01:44:52 | 11 | maybe not even understanding what's happening. |
| 01:44:54 | 12 | A.    Yes. |
| 01:44:56 | 13 | Q.    You recall that testimony.  Right? |
| 01:44:57 | 14 | A.    Yes. |
| 01:44:57 | 15 | Q.    Okay.  And I took from your testimony that you |
| 01:45:02 | 16 | felt that that phenomenon could cause family members in |
| 01:45:06 | 17 | certain instances to mistake a person's yes or no or |
| 01:45:11 | 18 | their -- their agreement with a request or a command as |
| 01:45:16 | 19 | an actual knowing, an intentional request, one in which |
| 01:45:20 | 20 | they understood the question, when, in fact, the person |
| 01:45:23 | 21 | may not actually understand what's happening.  Is that a |
| 01:45:25 | 22 | fair characterization? |
| 01:45:27 | 23 | A.    It is.  I've seen it many times. |
| 01:45:30 | 24 | Q.    What about in the scenario where that same |
| 01:45:32 | 25 | person that's suffering from the aphasia actually, |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:53:54 | 1 | MR. ABBOTT:  I was quiet -- |
| 01:53:54 | 2 | MR. MORRIS:  -- record. |
| 01:53:54 | 3 | MR. ABBOTT:  -- and I didn't testify -- |
| 01:53:58 | 4 | MR. MORRIS:  Well -- |
| 01:54:05 | 5 | (Reporter interrupts overlapping speakers.) |
| 01:54:05 | 6 | THE REPORTER:  Back on the record when you're |
| 01:54:05 | 7 | ready. |
| 01:54:05 | 8 | MR. MORRIS:  Big difference. |
| 01:54:10 | 9 | THE WITNESS:  I forgot your question.  I |
| 01:54:12 | 10 | apologize. |
| 01:54:13 | 11 | BY MR. ABBOTT: |
| 01:54:13 | 12 | Q.  My question is whether or not you're aware |
| 01:54:15 | 13 | whether Mrs. Ricotta had discussions with her attorney |
| 01:54:21 | 14 | and others about her estate planning intentions in the |
| 01:54:25 | 15 | months before her surgery. |
| 01:54:27 | 16 | A.  No, I don't know that. |
| 01:54:28 | 17 | Q.  Do you have any knowledge about her prior |
| 01:54:30 | 18 | intentions or plans with respect to her estate planning? |
| 01:54:32 | 19 | A.  None. |
| 01:54:39 | 20 | Q.  Okay.  And then do you see in paragraph 8 |
| 01:54:42 | 21 | where Ms. Walsh says, quote, As was my custom and |
| 01:54:45 | 22 | practice at the time, I did not provide the |
| 01:54:48 | 23 | aforementioned documents to Ellen for signature until I |
| 01:54:52 | 24 | was satisfied based on our discussions that she |
| 01:54:54 | 25 | understood them, that they reflected her genuine wishes, |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:54:57 | 1 | and that she was signing freely and not as a result of |
| 01:55:01 | 2 | undue influence by another.  It was clear to me from my |
| 01:55:04 | 3 | discussions with her that day that she understood the |
| 01:55:05 | 4 | terms contained in the documents, that the documents |
| 01:55:07 | 5 | reflected her genuine wishes, and that by signing them |
| 01:55:10 | 6 | she was doing so of her own free will. |
| 01:55:12 | 7 | A.    I see that, but -- |
| 01:55:15 | 8 | Q.    I'll -- I'll -- I have a question coming. |
| 01:55:17 | 9 | A.    Okay. |
| 01:55:17 | 10 | Q.    So -- |
| 01:55:18 | 11 | A.    Yes, I see that. |
| 01:55:19 | 12 | Q.    -- is -- is Ms. Walsh's description of |
| 01:55:24 | 13 | Mrs. Ricotta reflective of a different level of language |
| 01:55:31 | 14 | processing than the one you observed on January 22? |
| 01:55:34 | 15 | That's a yes-or-no question. |
| 01:55:38 | 16 | A.    I -- |
| 01:55:38 | 17 | MR. MORRIS:  No, she doesn't have to answer |
| 01:55:40 | 18 | yes or no. |
| 01:55:40 | 19 | You can answer. |
| 01:55:41 | 20 | THE WITNESS:  I'm going -- I'm going to say I |
| 01:55:43 | 21 | don't know.  And I'm going to elaborate because I |
| 01:55:48 | 22 | just -- I want to do the best I can to help who's ever |
| 01:55:54 | 23 | making this decision understand that even other |
| 01:56:00 | 24 | neurologists are not describing the language abilities |
| 01:56:05 | 25 | very well because they don't have some of the background |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:57:31 | 1 | Q.   My question was whether or not what Ms. Walsh |
| 01:57:35 | 2 | is describing about her interaction with Ellen on |
| 01:57:39 | 3 | January 29, 2007, reflects a different level of language |
| 01:57:47 | 4 | processing than what you observed on January 22. |
| 01:57:51 | 5 | MR. MORRIS:  Asked and answered.  She's given |
| 01:57:52 | 6 | you her answer. |
| 01:57:52 | 7 | THE WITNESS:  I -- |
| 01:57:53 | 8 | MR. MORRIS:  Do you have anything to add? |
| 01:57:54 | 9 | THE WITNESS:  I'm going to -- I'm going to add |
| 01:57:55 | 10 | it -- I'm going to answer it again to just make it |
| 01:57:57 | 11 | clear. |
| 01:57:57 | 12 | MR. ABBOTT:  Okay. |
| 01:57:58 | 13 | MR. MORRIS:  Asked and answered.  She can |
| 01:57:59 | 14 | answer as she sees fit. |
| 01:58:01 | 15 | THE WITNESS:  I'm going to just answer. |
| 01:58:03 | 16 | I don't know because I don't know if the |
| 01:58:07 | 17 | attorney misinterpreted her understanding based on what |
| 01:58:14 | 18 | people commonly do with intonation and gestures and |
| 01:58:18 | 19 | nodding.  Those are all nonverbal forms of |
| 01:58:22 | 20 | communication. |
| 01:58:24 | 21 | And a layperson may think -- even a |
| 01:58:29 | 22 | professional like a nurse practitioner may think that |
| 01:58:31 | 23 | someone is understanding a lot more than they actually |
| 01:58:34 | 24 | do.  I often have to educate ICU nurses and other |
| 01:58:41 | 25 | doctors about what a patient can and cannot do. |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 02:36:52 | 1 | Q.   When we talk about aphasia, does that |
| 02:36:55 | 2 | necessarily mean that a person does not at -- understand |
| 02:36:58 | 3 | what is being told to them? |
| 02:37:00 | 4 | A.   Yes.  If they have receptive aphasia, it means |
| 02:37:03 | 5 | that they are not comprehending.  Receptive aphasia is |
| 02:37:06 | 6 | your ability to comprehend. |
| 02:37:12 | 7 | Q.   Do you know whether Mrs. Ricotta was able to |
| 02:37:15 | 8 | accurately communicate her desires between January 22 |
| 02:37:19 | 9 | and February 16? |
| 02:37:21 | 10 | A.   No. |
| 02:37:25 | 11 | Q.   Do you know whether Mrs. Ricotta was |
| 02:37:27 | 12 | accurately able to communicate her desires on |
| 02:37:30 | 13 | February 22 -- or sorry -- on January 22? |
| 02:37:34 | 14 | A.   January 22 -- was that the date -- |
| 02:37:37 | 15 | Q.   2007. |
| 02:37:37 | 16 | A.   -- I saw her? |
| 02:37:38 | 17 | MR. MORRIS:  Yes. |
| 02:37:39 | 18 | BY MS. BURD: |
| 02:37:40 | 19 | Q.   Correct. |
| 02:37:42 | 20 | A.   What I can tell you is that she was fluent but |
| 02:37:46 | 21 | she had a lot of errors. |
| 02:37:48 | 22 | Q.   Uh-huh. |
| 02:37:49 | 23 | A.   So her language was very impaired. |
| 02:37:52 | 24 | Q.   Uh-huh. |
| 02:37:52 | 25 | A.   Severely impaired. |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

02:37:54   1      Q.    Okay.
02:37:54   2      A.    So she might be able to express some broken
02:37:58   3    ideas, but there wouldn't be anything complex.
02:38:03   4      Q.    Earlier you gave the example of -- of someone
02:38:06   5    who said, "Please hand me that pencil," but pointed at a
02:38:11   6    pen.  Correct?
02:38:12   7      A.    Correct.
02:38:13   8      Q.    Would it be fair to state that that person
02:38:16   9    accurately communicated what they wanted even though
02:38:20  10    they got the word right -- wrong?
02:38:22  11      A.    That -- that hypothetical, yes, they did
02:38:25  12    communicate.  I was showing you how you might
02:38:27  13    communicate and have an impairment but get your idea
02:38:31  14    across.
02:38:32  15      Q.    Uh-huh.  And on January 22 was Mrs. Ricotta
02:38:35  16    able to get her ideas across despite her impairments?
02:38:39  17      A.    No.
02:38:39  18      Q.    On --
02:38:41  19      A.    She was -- she was severely impaired.
02:38:43  20      Q.    On February 16 was Mrs. Ricotta able to get
02:38:46  21    her ideas across?
02:38:48  22      A.    Yes.
02:38:49  23      Q.    So at some point between January 22 and
02:38:52  24    February 16, 2007, Miss Ricotta improved sufficiently to
02:38:56  25    get her intentions and ideas across?

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| 03:24:14 | 1 | That's fine. |

03:24:14  1   That's fine.
03:24:15  2   BY MR. STILWELL:
03:24:15  3      Q.   That's -- but this is not his turn, so --
03:24:18  4      A.   Okay.
03:24:18  5      Q.   So what I am hearing from you is that, based
03:24:24  6   off of your observations of her on the 22nd, okay, and
03:24:28  7   your observations of her on the -- on February 16th and
03:24:35  8   your experience and knowledge, that you do not believe
03:24:41  9   that she could understand certain things.  Is that
03:24:43 10   correct?
03:24:43 11      A.   That's correct.
03:24:44 12      Q.   Okay.  However, is it also true that, because
03:24:49 13   you were not in the room on January 29, you do not for
03:24:55 14   sure, 100 percent actually know that she didn't?  Is
03:25:00 15   that fair to say?
03:25:01 16          MR. MORRIS:  Vague, overbroad.
03:25:03 17          THE WITNESS:  I would say it's -- it's
03:25:05 18   100 percent certain that my opinion is she would not
03:25:11 19   have been able to, based on looking at my exam on the
03:25:17 20   22nd, that -- based on her exam on the 12th and on the
03:25:23 21   22nd --
03:25:24 22   BY MR. STILWELL:
03:25:25 23      Q.   But I don't want your opinion at this point in
03:25:27 24   time.
03:25:27 25          MR. MORRIS:  That's what you asked for.

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 03:42:11 | 1 | during that approximately one-month period she had ups |
| 03:42:15 | 2 | and downs on the steady improvement spectrum? |
| 03:42:18 | 3 | A.   Yes.  Most people do. |
| 03:42:36 | 4 | Q.   In terms of the aphasia that |
| 03:42:38 | 5 | Mrs. Ricotta -- strike that. |
| 03:42:42 | 6 | In terms of the aphasia that you observed in |
| 03:42:45 | 7 | Mrs. Ricotta on -- strike that.  Let me start over.  I |
| 03:42:55 | 8 | apologize. |
| 03:43:01 | 9 | On February 16 was Mrs. Ricotta's ability to |
| 03:43:11 | 10 | read and understand language different from her ability |
| 03:43:15 | 11 | to hear and understand the same language? |
| 03:43:23 | 12 | A.   Receptive language is two components.  It's |
| 03:43:29 | 13 | listening and processing and reading.  And those are |
| 03:43:34 | 14 | both receptive components.  And if you have a severe |
| 03:43:39 | 15 | impairment in your auditory, you will have a severe |
| 03:43:43 | 16 | impairment in your reading. |
| 03:43:47 | 17 | Did that answer your question? |
| 03:43:48 | 18 | Q.   Not exactly, although -- |
| 03:43:49 | 19 | A.   Because -- okay. |
| 03:43:49 | 20 | Q.   -- it helps me understand better. |
| 03:43:52 | 21 | A.   Try to ask me different.  Maybe I can do it. |
| 03:43:55 | 22 | Q.   The -- what I'm getting at is whether or not |
| 03:43:58 | 23 | when a person has what you refer to as a receptive |
| 03:44:01 | 24 | aphasia -- |
| 03:44:03 | 25 | A.   Yes. |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

03:44:03 1        Q.    -- does that present as a different level of
03:44:09 2     processing deficit depending on whether they're hearing
03:44:13 3     or reading?  Or is the hearing and the reading just as
03:44:18 4     bad when someone has receptive aphasia?
03:44:23 5        A.    If -- it -- they're both receptive.  And if
03:44:27 6     you have a severe impairment in one, you're going to
03:44:30 7     have a severe impairment in the other if it's all from
03:44:35 8     the aphasia.
03:44:39 9              Now, there are some times when people have
03:44:41 10    brain disorders in other places where they have more of
03:44:45 11    a problem with writing or they can write but not read,
03:44:52 12    but this is not this patient.  This patient's going to
03:44:56 13    be equal.
03:44:58 14       Q.    So does that mean that when you observed
03:45:00 15    Mrs. Ricotta, for example, on January 22 that she would
03:45:05 16    have the same difficulty processing a sentence that was
03:45:12 17    read to her out loud as she would if she read it
03:45:16 18    herself?
03:45:16 19       A.    She's going to have about the same deficit,
03:45:19 20    yes.
03:45:20 21       Q.    And when you say "about the same," are you
03:45:24 22    qualifying it for some reason?
03:45:26 23       A.    Yeah.
03:45:27 24       Q.    And why is that?
03:45:28 25       A.    Because if I tested her and had her read it

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 03:57:30 | 1 | just give them commands and things to find out what is |
| 03:57:34 | 2 | that brain actually processing.  And I would say that |
| 03:57:39 | 3 | the attorney probably believed that she understood.  She |
| 03:57:43 | 4 | probably -- her declaration -- I would say -- I would |
| 03:57:46 | 5 | trust that the attorney believed that she did. |
| 03:57:50 | 6 | Q.   And -- and part of the attorney's testimony |
| 03:57:52 | 7 | was that Mrs. Ricotta herself spoke back to the attorney |
| 03:57:55 | 8 | and described what she wanted. |
| 03:57:58 | 9 | MR. MORRIS:  Misstates testimony. |
| 03:57:58 | 10 | BY MR. ABBOTT: |
| 03:57:59 | 11 | Q.   Are you -- you recall I read you that -- that |
| 03:58:01 | 12 | passage? |
| 03:58:02 | 13 | A.   Yeah, I recall that. |
| 03:58:03 | 14 | Q.   Are you -- what's your take on the likelihood |
| 03:58:05 | 15 | that that really happened?  Is it that it happened and |
| 03:58:07 | 16 | the attorney just didn't understand what the words were |
| 03:58:11 | 17 | that were coming out of her mouth, or is it that it's |
| 03:58:13 | 18 | unlikely that Mrs. Ricotta actually said anything to |
| 03:58:15 | 19 | her? |
| 03:58:15 | 20 | A.   I wasn't there, so I can't, like -- I can't |
| 03:58:20 | 21 | sit there and pick apart that and say where the flaws |
| 03:58:23 | 22 | were, but it -- the whole situation is flawed. |
| 03:58:28 | 23 | Q.   What does that mean, "flawed"? |
| 03:58:30 | 24 | A.   The whole -- the whole entire exchange of |
| 03:58:37 | 25 | reading the agreement, explaining the agreement, having |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 03:58:41 | 1 | her express her understanding.)  Because she was so |
| 03:58:47 | 2 | aphasic, I think the whole situation cannot be trusted, |
| 03:58:53 | 3 | not that you can't trust the attorney, who I'm sure |
| 03:58:59 | 4 | believes that she -- that she understood it.  She -- she |
| 03:59:03 | 5 | wouldn't have testified to that. |
| 03:59:06 | 6 | Q.   I guess -- |
| 03:59:07 | 7 | A.   I trust -- I trust her deposition. |
| 03:59:09 | 8 | Q.   I guess -- |
| 03:59:09 | 9 | A.   Her declaration. |
| 03:59:11 | 10 | Q.   I guess what I'm wondering is, if Mrs. Ricotta |
| 03:59:14 | 11 | speaks words that are generally understood in English to |
| 03:59:16 | 12 | convey certain concepts given, the conditions that you |
| 03:59:21 | 13 | observed her to have at that time, does that mean that |
| 03:59:25 | 14 | the words had no meaning to Mrs. Ricotta and she was |
| 03:59:29 | 15 | just parroting back things?  Does that mean that |
| 03:59:31 | 16 | Mrs. Ricotta meant it and had a moment of clarity? |
| 03:59:36 | 17 | A.   Well, I think -- |
| 03:59:36 | 18 | Q.   What's the explanation? |
| 03:59:37 | 19 | A.   -- it's a -- it's a good point that you make |
| 03:59:39 | 20 | because there's a condition called perseveration in |
| 03:59:45 | 21 | aphasia.  And perseveration is repeating the same thing |
| 03:59:50 | 22 | over and over again. |
| 03:59:53 | 23 | And you saw in her very -- you know, very |
| 03:59:55 | 24 | first exam with Dr. Rawat that she perseverated.  Right? |
| 04:00:01 | 25 | She said she perseverated.  And perseveration is, like, |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

```
 1              DECLARATION UNDER PENALTY OF PERJURY

 2

 3          I, Cynthia Elizabeth Spier, M.D., the witness

 4   herein, declare under penalty of perjury that I have

 5   read the foregoing in its entirety; and that the

 6   testimony contained herein is a true and accurate

 7   transcription of my testimony elicited at said time and

 8   place.

 9          Executed this _____ day of _____,

10   20_____.

11

12                              _____

13                              Cynthia Elizabeth Spier, M.D.

14

15

16

17

18

19

20

21

22

23

24

25
```

Cynthia Elizabeth Spier, M.D. - 3/10/2020

1                    REPORTER'S CERTIFICATE

2

3          I, Veronica S. Thompson, Certified Shorthand

4    Reporter for the State of California, do hereby certify:

5          That the witness named in the foregoing

6    deposition was by me duly sworn; that the deposition was

7    then taken before me at the time and place herein set

8    forth; that the testimony and proceedings were reported

9    stenographically by me and were transcribed through

10   computerized transcription by me; that the foregoing is

11   a true record of the testimony and proceedings taken at

12   that time; and that I am not interested in the event of

13   the action.

14         Witness my hand dated March 23, 2020.

15

16

17         _Veronica S Thompson_

18         Veronica S. Thompson

19         CSR 6056, RPR, CRR

20

21

22

23

24

25

# EXHIBIT 4

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**CENTRAL**

**MINUTE ORDER**

DATE: 02/22/2019                    TIME: 10:30:00 AM          DEPT: C-64

JUDICIAL OFFICER PRESIDING: John S. Meyer
CLERK: Herlinda Chavarin
REPORTER/ERM: Dulcemaria Duarte CSR 13968
BAILIFF/COURT ATTENDANT: J. Pedroza/Z. Nuheir

CASE NO: **37-2018-00062311-CU-FR-CTL**  CASE INIT.DATE: 12/11/2018
CASE TITLE: **Ricotta vs Ricotta [IMAGED]**
CASE CATEGORY: Civil - Unlimited     CASE TYPE: Fraud

---

**EVENT TYPE**: Motion Hearing (Civil)

---

**APPEARANCES**
Christopher S Morris, counsel, present for Plaintiff(s).
Daniel W Abbott, counsel, present for Defendant(s).
Iris Gomez, counsel, is present for Defendants Barry Fefferman and The Bit Company

The Court hears oral argument and CONFIRMS the tentative ruling as follows:

Plaintiff Lance Z. Ricotta brings this motion, seeking an order appointing a receiver and issuing a preliminary injunction.

"A receiver may be appointed, in the manner provided in this chapter, by the court in which an action or proceeding is pending in any case in which the court is empowered by law to appoint a receiver." CCP §564(a).

"A receiver may be appointed by the court in which an action or proceeding is pending ...[i]n an action ... between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured." CCP §564(b)(1).

"The appointment of a receiver is a drastic remedy, may involve unnecessary expense and hardship and courts carefully weigh the propriety of such appointment in exercising their discretion to appoint a receiver particularly if there is an alternative remedy." *Hoover v. Galbraith* (1972) 7 Cal.3d 519, 528.

Plaintiff has not shown that it is probable that Lancair Corporation "is in danger of being lost, removed, or materially injured." Plaintiff asserts that corporation is being mismanaged and that the corporation is being used for personal gain. But what the evidence demonstrates is that Ms. Goddard and Mr. Kirsch did not have sufficient information and/or documents needed to analyze Lancair's books and evaluate

---

CASE TITLE: Ricotta vs Ricotta [IMAGED]          CASE NO: **37-2018-00062311-CU-FR-CTL**

the company.

There is the possibility that Defendants Thomas D. Ricotta and Jeanne Ricotta may attempt to proceed with the proposed sale of the business, without plaintiff's approval or without time to analyze the Lancair's books. But that fact does not support the appointment of a receiver. Injunctive relief would suffice.

**THEREFORE**, Defendants Thomas D. Ricotta and Jeanne Ricotta are hereby enjoined from selling Lancair Corporation until further order of this court.   It would be in the best interests of all parties if the parties would arrange for a face to face meeting between Ms. Goddard and Mr. Fefferman to jointly review the books as soon as possible.

The Court confirms without prejudice for defendant to file an Application for a Bond.

**IT IS SO ORDERED:**

_____
Judge John S. Meyer

# EXHIBIT D



**U.S. Department of Justice**

*Randy S. Grossman*
*United States Attorney*
*Southern District of California*

*Tel 619-546-7167*
*Fax 619-546-0720*

*San Diego County Office*
*Federal Office Building*
*880 Front Street, Room 6293*
*San Diego, CA 92101-8893*

*Imperial County Office*
*321 South Waterman Avenue*
*Room 204*
*El Centro, CA 92243-2215*

August 19, 2022

Edward A. Rose, Jr., Esq.
Counsel for William Wagner
3027 Marina Bay Drive, Suite 208
League City, Texas 77573
Telephone: (713) 581-6029
Facsimile: (832) 201-9960
Email: edrose@edroseattorneycpa.com

> Subj.: In the Matter of the Safety Investigation Relating to Lance Ricotta
> Subpoena from the Federal Aviation Administration

Dear Mr. Rose:

This letter follows on the two administrative subpoenas served by the Federal Aviation Administration ("FAA") upon William Wagner both for documents and for his deposition testimony. To date, Mr. Wagner has not complied with either subpoena.

### Background

On March 16, 2022 the FAA signed and served the enclosed administrative subpoena duces decum calling for the production of documents upon Mr. Wagner. This was served by Fedex overnight delivery. To date, no documents have been produced.

On April 26, 2022, the FAA signed the enclosed administrative subpoena for the deposition of Mr. William Wagner that was served on April 27, 2022 by Fedex overnight delivery. This subpoena called for Mr. Wagner's deposition to occur at 2:00 p.m. on May 5, 2022 in San Diego. Mr. Wagner did not appear for his deposition on the designated date and time.

On May 25, 2022, Mr. Wagner through his counsel served objections to the subpoena duces tecum, without offering to produce any documents. On May 26, 2022, Lance Ricotta, a person to whom the subpoenas have not been directed, served the FAA with a "Motion to Quash Subpoena For Deposition of Mr. William Wagner." The motion does not appear to have been filed in any relevant court of record.

081

In the Matter of the Safety Investigation Relating to Lance Ricotta
Letter to Edward A. Rose, Esq.
August 19, 2022
Page 2 of 2

## Legal Authorities

It is well established under 49 USC § 46104(b) that the FAA may issue administrative subpoenas in support of conducting hearings or investigations. This investigative power has been further recognized and enforced by the United States Supreme Court. *Civil Aeronautics Bd. v. Hermann*, 353 U.S. 322, 323-324 (1957). In the *Hermann* case, the Supreme Court enforced an administrative subpoena by the Civil Aeronautics Board, a predecessor of the FAA, that arose in the Southern District of California, the same district in which this matter now arises. Pursuant to 49 USC § 46104(b), should a party refuse to comply with an administrative subpoena, the FAA may petition a district court to enforce the subpoena, and seek contempt of court. The relevant portion is included below:

> **(b) Compliance with subpoenas.**--If a person disobeys a subpoena, the Secretary, the Administrator of the Transportation Security Administration, the Administrator of the Federal Aviation Administration, or a party to a proceeding before the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration may petition a court of the United States to enforce the subpoena. **A judicial proceeding to enforce a subpoena under this section may be brought in the jurisdiction in which the proceeding or investigation is conducted. The court may punish a failure to obey an order of the court to comply with the subpoena as a contempt of court.**

49 USC § 46104(b) (emphasis added)

Because Mr. Wagner has refused to comply with the FAA's two administrative subpoenas, the next step will be for this office to petition the United States District Court in the Southern District of California to enforce the two subpoenas, and to concurrently seek appropriate remedies which may include a contempt order. The United States intends to proceed with that petition by **September 9, 2022**. If you have any questions, you may contact me at (619) 546-7167 or by email at steve.chu@usdoj.gov.

Very truly yours,

STEVE B. CHU
Assistant United States Attorney

Enclosures