1   Jacob A. Gillick, Esq., SBN 312336
    jgillick@phglawgroup.com
2   PHG Law Group
    501 West Broadway, Suite 1480
3   San Diego, CA 92101
    Telephone:  (619) 826-8060
4   Facsimile:  (619) 826-8065

5   Attorneys for Objector Lance Z. Ricotta

6

7

8                   UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          Case No. 22cv1791 WQH AHG

12                    Plaintiff,       **DECLARATION OF JACOB A.
                                       GILLICK IN SUPPORT OF
13        v.                           OPPOSITION TO PETITION
                                       TO ENFORCE THE UNITED
14  WILLIAM WAGNER,                    STATES FEDERAL AVIATION
                                       ADMINISTRATION'S
15                    Defendants.      SUBPOENA TO WILLIAM
                                       WAGNER**
16

17

18

19

20

21

22

23

24

25

26

27

28

                                    1

I, Jacob A. Gillick, declare as follows:

1.    I am an attorney licensed to practice in the State of California and am a Partner with PHG Law Group and counsel of record for Objector Lance Ricotta. I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would testify as such.

2.    Attached hereto as Exhibit 1 are true and correct copies of the subpoenas served on William Wagner ("Wagner"), with Wagner Aeronautical, Inc.

3.    Attached hereto as Exhibit 2 is a true and correct copy of the probate petition filed by Lance Ricotta against Thomas Ricotta.

4.    Attached hereto as Exhibit 3 are excerpts from the deposition of Dr. Spier, Mrs. Ricotta's treating physician which show her capacity at the time in question.  Mrs. Ricotta's trust is the subject of the probate petition.

5.    Attached hereto as Exhibit 4 is the order from the Honorable John Meyer which part of the civil litigation matter that Lance Ricotta has also filed against Thomas Ricotta, Judge Meyer has enjoined Tom from selling the FBO as he had been threatening.

6.    Exhibit 5 is a true and correct copy of videos where Tom Ricotta tells Lance that he is going to lose the lawsuit because "the Feds are going to crawl up [his] ass."  Exhibit 5 can be accessed in

https://www.dropbox.com/s/42md0i1grcjkzin/Video%20Mar%2015%2C%2011%2007%2039%20AM.mov?dl=0

I declare under penalty of perjury, under the law of the United States of America, that the foregoing is true and correct.  Executed this 12th day of December, 2022, in San Diego, California.

*s/ Jacob A. Gillick*
Jacob A. Gillick

DEC IN OPPO TO PET TO ENFORCE SUBPOENA          22CV1791-WQH-AHG

# EXHIBIT 1



U.S. Department
of Transportation

**Federal Aviation
Administration**

Office of the Chief Counsel

Enforcement Division
Midwest Team

## VIA FED-EX OVERNIGHT MAIL

March 15, 2022

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

**Re:    IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO LANCE
RICOTTA.**

Dear Mr. Wagner:

Attached is a subpoena for deposition. This deposition is necessary as part of the Federal
Aviation Administration's investigation relating to the above-captioned matter. Specifically the
FAA investigation is related to alleged flight operations conducted by Lance Ricotta while Mr.
Ricotta may have been required to hold an air carrier certificate in order to conduct such
operations.

Standard Form 1157, Claim for Witness Attendance Fees, Travel, and Miscellaneous Expenses
and Instructions to Witness, is enclosed. Please complete the Standard Form 1157 after the
deposition, and return it to this office within one week of the completion of the deposition. If you
have any questions regarding reimbursable expenses or the completion of this form, please
contact the undersigned attorney.

Upon your receipt of this subpoena, please contact the undersigned attorney to discuss this
matter.

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

By: **BRIAN K KHAN**

Digitally signed by
BRIAN K KHAN
Date: 2022.03.16
13:44:56 -04'00'

Brian K. Khan, Esq.
Enforcement Division, Midwest Team
AGC-300, Room 917M
800 Independence Avenue SW
Washington, D.C. 20591
T: 202-267-4771
F: 202-267-5106
E: brian.k.khan@faa.gov

# UNITED STATES OF AMERICA
## DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION
## OFFICE OF THE CHIEF COUNSEL
## ENFORCEMENT DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO LANCE RICOTTA. | **SUBPOENA FOR DEPOSITION** |

TO:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

At the instance of the Federal Aviation Administration (FAA), you are hereby required to appe
before a person having the power to administer oaths, at the date, time and place specified belo
and to give testimony under oath pertinent to the subject investigation. Specifically, the FAA
depose you regarding transportation by air provided to you by Lance Ricotta.

## DATE AND TIME FOR TAKING OF DEPOSITION:

Date: April 7, 2022
Time: 2:00 P.M. Pacific Daylight Time

## PLACE FOR TAKING OF DEPOSITION:

This deposition will take place at:

San Diego Flight Standards District Office
Montgomery-Gibbs Executive Airport
8525 Gibbs Drive
San Diego, CA 92123

## **AUTHORITY**

This subpoena is issued pursuant to the provisions of 14 Code of Federal Regulations (C.F.R.) Section 13.3, is authorized under the provisions of 49 United States Code (U.S.C.) Sections 40113(a), 46101, 46104, 46313, and is judicially enforceable under 49 U.S.C. Section 46104(b)

You are required to attend and to testify at this deposition at the appointed time. Moreover, refusal to comply with this subpoena may result in criminal prosecution pursuant to 49 U.S.C. Section 46313.

The undersigned, an officer designated by the Administrator of the Federal Aviation Administration, executed this subpoena in Washington, D.C., this 15th day of March 2022.

CYNTHIA A    Digitally signed by
             CYNTHIA A DOMINIK
DOMINIK      Date: 2022.03.15 14:39:24
             -04'00'

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Subpoena for Deposition regarding In The Matter Of The Safety Investigation Relating To Lance Ricotta, has been sent this date by FedEx – overnight delivery to:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Dated:        **MAR 1 6 2022**

Jeff Kamberg, Management and Program Analyst
Enforcement Division-Western Team
National Enforcement Program
Federal Aviation Administration
Des Moines, Washington

3

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION
OFFICE OF THE CHIEF COUNSEL
ENFORCEMENT DIVISION

**IN THE MATTER OF THE SAFETY INVESTIGATION RELATING TO LANCE RICOTTA.**

SUBPOENA FOR DEPOSITION

TO:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

At the instance of the Federal Aviation Administration (FAA), you are hereby required to appear before a person having the power to administer oaths, at the date, time and place specified below, and to give testimony under oath pertinent to the subject investigation. Specifically, the FAA will depose you regarding transportation by air provided to you by Lance Ricotta.

**DATE AND TIME FOR TAKING OF DEPOSITION:**

Date: May 5, 2022
Time: 2:00 P.M. Pacific Daylight Time

**PLACE FOR TAKING OF DEPOSITION:**

This deposition will take place at:

San Diego Flight Standards District Office
Montgomery-Gibbs Executive Airport
8525 Gibbs Drive
San Diego, CA 92123

4

## AUTHORITY

This subpoena is issued pursuant to the provisions of 14 Code of Federal Regulations (C.F.R.) Section 13.3, is authorized under the provisions of 49 United States Code (U.S.C.) Sections 40113(a), 46101, 46104, 46313, and is judicially enforceable under 49 U.S.C. Section 46104(b).

You are required to attend and to testify at this deposition at the appointed time. Moreover, refusal to comply with this subpoena may result in criminal prosecution pursuant to 49 U.S.C. Section 46313.

The undersigned, an officer designated by the Administrator of the Federal Aviation Administration, executed this subpoena in Washington, D.C., this 26th day of April 2022.

CYNTHIA A       Digitally signed by CYNTHIA A
DOMINIK         DOMINIK
                Date: 2022.04.26 16:40:01
                -04'00'

Cynthia A. Dominik
Assistant Chief Counsel for Enforcement

5

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Subpoena for Deposition regarding In The Matter Of The Safety Investigation Relating To Lance Ricotta, has been sent this date by FedEx – overnight delivery to:

Mr. William Wagner
Wagner Aeronautical, Inc.
613 W. Valley Parkway
Ste. 220
Escondido, CA 92025

Date: 4/27/2022

# EXHIBIT 2

1   Christopher S. Morris, SBN 16188
    cmorris@morrislawfirmapc.com
2   Byron K. Husted SBN 281431
    byron@morrislawfirmapc.com
3   MORRIS LAW FIRM, APC
    501 West Broadway, Suite 1480
4   San Diego, CA 92101
    Telephone: (619) 826-8060
5   Facsimile: (619) 826-8065

6   Attorneys for Lance Z. Ricotta

7

8

9

10

                                FILED
                        PROBATE DIVISION

                        2018 NOV 20  PM 12: 19

                        CLERK-SUPERIOR COURT
                        SAN DIEGO COUNTY, CA

                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

                            COUNTY OF SAN DIEGO

11  In re:                                  Case No.   37-2018-00058591-PR-TR-CTL

12  THE ETL TRUST, UDT 3/30/2005            ROA # 1

13                                          PETITION FOR ORDER TO COMPEL
                                            TRUSTEE TO ACCOUNT, MAKE
14                                          DISTRIBUTIONS, AND TEMPORARY
                                            SUSPENSION
15
                                            [Prob. Code §§17200, 16063]
16
                                            Date:
17                                          Time:
                                            Dept.:
18                                          Judge:

19

20      Petitioner Lance Z. Ricotta ("Petitioner"), as fifty percent (50%) beneficiary of the ETL

21  Trust, dated March 30, 2005 ("ETL Trust"), hereby petitions the Court For (1) Order to Compel

22  Trustee to Account, (2) Order to Compel Trustee to Distribute Assets, and (3) Temporary

23  Suspension, as follows:

24                                          I.

25                                      STANDING

26      1.      Petitioner has standing to bring this petition as the son of the deceased Grantor of

27  the ETL Trust, Ellen A. Ricotta ("Mrs. Ricotta"), and under Cal. Prob. Code Section 17200 as

28  beneficiary of the ETL Trust.

                                            1

**II.**

**JURISDICTION AND VENUE**

2.    Jurisdiction and Venue is proper in San Diego County because the principle place of administration of the ETL Trust is located in San Diego County, California.

**III.**

**INTRODUCTION**

3.    Petitioner is owed approximately $13,000,000 to $15,000,000 in distributions from the ETL Trust (not including damages against the trustee). Respondent and Trustee, Thomas D. Ricotta ("Respondent"), Petitioner's brother, refuses to provide a trust accounting and make distributions. Petitioner is entitled to a full accounting from 2010 to present date in order to assess his damages against the Respondent for breach of trust.

**IV.**

**STATEMENT OF FACTS**

**A.    FAMILY HISTORY**

4.    Petitioner and Respondent are Mrs. Ricotta's only children. At the start of 2005, Mrs. Ricotta was a single mom assisting Petitioner hold ownership of and run a company Petitioner started (the "Business"). For various reasons, Petitioner had allowed his mother to take over ownership to assist him with management.

5.    In order to help Respondent, Petitioner agreed to gift ten percent ownership of the Business to Respondent and hired him to also help run the Business.

6.    Unfortunately, at the end of 2006 Mrs. Ricotta was being treated for Lyme's disease along with a multitude of other illnesses. As a result, Respondent stepped in and took over the management of Mrs. Ricotta's finances. Starting in 2005, Petitioner is informed and believes that Respondent became concerned about his mother's health and convinced her to set up a trust (the "ETL Trust").

7.    Even though Petitioner alone had started the Business, Petitioner is informed and believes that Respondent convinced Mrs. Ricotta to transfer ownership of it into the ETL Trust.

///

2

1        8.     Mrs. Ricotta executed the ETL Trust and transferred ninety percent ownership of

2 the Business into it on March 30, 2005. (See ETL Trust[1].) However, it was always understood

3 that the company was started by Petitioner, and belonged to Petitioner.

4        9.     Under Article IV, subsection C., Mrs. Ricotta instructed that upon her death the

5 stocks of the Business be "distributed to each son in such a way so that each son will ultimately

6 own equal shares of the corporate stock." She then indicated that, "Thomas Daniel Ricotta,

7 Jr.[Respondent] owns ten (10) shares." Even though Petitioner did not agree with or consent to

8 the ownership of the Business in his mother's trust, he did not want to cause any family discord

9 and chose not to object.

10      10.     On information and belief, from 2006 forward, Respondent handled Mrs. Ricotta's

11 estate, wrote all her checks, and eventually let her house go into foreclosure. However, the next

12 ten years brought untold success and growth to the Business. Mrs. Ricotta maintained a strong

13 relationship with both her sons during this time. She also maintained that she wanted to make

14 sure that both her sons were equal owners of the Business after she passed.

15      11.     Then, on December 27, 2006, Mrs. Ricotta was brought into Kaiser Permanente

16 for, among other things, "memory loss" and "confusion." She was diagnosed with the following

17 terminal brain issues:

18      •    Marked vasogenic edema with left temporal lobe and corpus callosum

19            marked mass effect;

20      •    Subfalcine and incisural herniation of marked degree with low cerebellar

21            tonsils.

22      •    Multiple meningiomas;

23      •    Right lateral ventricular flow obstruction;

24      •    Abnormal brainstem signals; and

25      •    Possible metastasis and Cerebral lymphoma.

26   / / /

27   / / /

28   [1] The ETL Trust is submitted confidentially per SDSC Local Rule 4.3.3.J and submitted herewith.

1      12.     Within a week Mrs. Ricotta went through major brain surgery. It was noted in her

2   medical records that after surgery she had significant diminishment in her mental capacity.

3      13.     Within days of the start of her long and difficult recovery, on January 29, 2007,

4   Respondent clandestinely orchestrated the creation of the First Amendment to the ETL Trust,

5   which manipulated the distribution provisions of the ETL Trust into making sure that upon Mrs.

6   Ricotta's death Respondent would appear to own fifty-five percent of the Business and Petitioner

7   would only own forty-five percent. See First Amendment to the ETL Trust[2].

8      14.     On information and belief, Mrs. Ricotta did not execute the First Amendment.

9   And if she did, she could not understand the documents, or their affects on her estate plan.

10   Petitioner had no knowledge of the First Amendment, either before or after his mother's death.

11     **B.**     **ETL TRUST ADMINISTRATION**

12      15.     Mrs. Ricotta never fully recovered from her brain surgery and passed away in

13   2009. Respondent took over management of the ETL Trust at that time. Respondent never

14   informed Petitioner that there was a First Amendment. Respondent never indicated that he

15   believed Petitioner only had a right to forty-five percent of the assets the ETL Trust.

16      16.     Rather, for the last seven years, Respondent represented to Petitioner that they had

17   equal rights to the assets of the ETL Trust, including equal ownership interest in the business, and

18   Respondent was only holding the Business in the ETL Trust for Petitioner's benefit. Further,

19   Respondent continually represented to Petitioner that the distributions of net income between

20   them from the date of their mother's death to current date were always an equal fifty-fifty

21   between them.

22      17.     Now that Petitioner wants his shares distributed in accordance with the terms of

23   the ETL Trust, Petitioner has demanded that Respondent provide a full accounting of the ETL

24   Trust and make the appropriate distribution. Respondent not only refuses to provide an

25   accounting, but also refuses to distribute Petitioner's share of the ETL Trust. **As the ETL Trust**

26   / / /

27

28   [2] The First Amendment to the ETL Trust is submitted confidentially per SDSC Local Rule 4.3.3.J and submitted herewith

1   **and Business should be worth over $35,000,000 million, Petitioner's concern for an**

2   **accounting and for his distribution is well warranted.**

3       18.    After some investigation and review of the Business records, on information and

4   belief there appears to be over $5,000,000 dollars missing or misappropriated by Respondent.

5       19.    To try and cover up his malfeasance, Respondent is now trying to sell the Business

6   out from under Petitioner. Petitioner has sent several cease and desist letters demanding that

7   Respondent not sell Petitioner's shares, provide an accounting, and distribute Petitioner's shares.

8   Respondent refuses to comply.

9                         **CAUSES OF ACTION**

10      **PETITION FOR ORDER (1) TO COMPEL TRUSTEE TO ACCOUNT, (2) TO**

11     **DISTRIBUTE PETITIONER'S SHARES, AND (3) SUSPEND AND ENJOIN**

12         **RESPONDENT TRUSTEE FROM SELLING TRUST ASSETS**

13        **(Prob. Code, §§ 15642, 16420, 16003, 17206 &17200(b)(7))**

14       20.    Petitioner incorporates and alleges all the foregoing allegations as though fully set

15   fourth herein. A successor trustee is under a duty to deal impartially with any beneficiary and to

16   act only for their benefit. (See Prob. Code § 16003.)

17       21.    A trustee is bound to act in the highest good faith towards the beneficiary and may

18   not obtain any advantage by the slightest misrepresentation, concealment, threat, or adverse

19   pressure of any kind. (*Estate of Vokal* (1953) 121 Cal.App.2d 252, 257.) A Breach of trust is a

20   violation by the trustee of any duty that the trustee owes a beneficiary. (See Prob. Code § 16400.)

21   Furthermore, a trustee may be suspended at any time if a Court deems appropriate and necessary

22   to protect the assets. (Prob. Code § 15642.)

23       22.    Since before Mrs. Ricotta's death, Respondent has taken control over the

24   management of the ETL Trust. It has been over seven years from Mrs. Ricotta's death and

25   Respondent still refuses to provide an accounting of the ETL Trust, or distribute Petitioner's fifty

26   percent interest in the business in accordance with the terms of the ETL Trust.

27       23.    Further, Petitioner believes that Respondent has also concealed that he has been

28   misappropriating millions of dollars in income from the ETL Trust for his sole benefit.

1  Respondent's plan to bury his misdeeds is to try and sell the ETL Trust assets and business away

2  from Petitioner and force Petitioner to take a cash settlement. Petitioner wants his share of the

3  business and will not agree to sell it.

4        24.     Respondent must not be allowed to continue his dishonest administration of the

5  ETL Trust. Petitioner requests an immediate order (1) for Respondent to file a full accounting

6  under California Probate Code section 16063 from February 1, 2007, to current date, (2)

7  enjoining Respondent from selling any assets belonging to the ETL Trust, or that Respondent

8  wrongfully took from Mrs. Ricotta and the ETL Trust, (3) suspending Respondent as successor

9  trustee of the ETL Trust, and (4) appointment of Petitioner as successor trustee. If the Court

10  prefers, Petitioner will select and a third party independent fiduciary to step in as interim trustee.

11        25.     After the accounting is provided, Petitioner will seek further damages, return of

12  misappropriated assets, and surcharge, if necessary.

13        26.     The names, addresses, and relationships of all interested persons and beneficiaries

14  named in ETL Trust, so far as they are known or reasonably ascertainable by Petitioner, are as

15  follows:

16

| Name & Address | Relationship |
| --- | --- |
| Thomas Ricotta<br>2982 Night Watch Way<br>Alpine, CA 91901 | Trustee and Beneficiary |

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28

6

**Wherefore, Petitioner Respectfully Prays for the Following:**

1.    Order for Tom Ricotta to file an accounting with this Court under California Probate Code section 16063 from February 1, 2007, to present date;

2.    Order enjoining Tom Ricotta from selling any asset or business belonging to the ETL Trust;

3.    Order for Tom Ricotta to distribute Lance Ricotta's share of the ETL Trust;

4.    Order Suspending Tom Ricotta as Successor Trustee of the ETL Trust;

5.    Order appointing an interim trustee;

6.    For cost of suit and attorney's fees herein;

Respectfully submitted,

**MORRIS LAW FIRM, APC**

Dated: November 20, 2018

By: _____
Christopher S. Morris, Esq.
Byron K. Husted, Esq.
Attorneys for Petitioner Lance Z. Ricotta

7

1  <center>Verification</center>
2     I, Lance Ricotta am the Petitioner in the above-entitled proceedings. I have read the
3  foregoing Petition For Accounting and Suspension. The matters alleged in the Petition are true
   based on my own knowledge, except as to those matters stated on information and belief, and as to
4  those matters I believe them to be true.
5     I declare under penalty of perjury under the laws of the State of California that the foregoing
   is true and correct and that this verification was executed on November___13_, 2018 at
6  _____San Marcos_____, California.
7
8                                        Lance Ricotta
9                                        Lance Ricotta
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<center>7
PETITION FOR ACCOUNTING AND SUSPENSION</center>

# EXHIBIT 3

Superior Court of California
County of San Diego

In re:                              )
                                    )
The ETL Trust, UDT 3/30/2005        )
                                    )
                                    )
_____     )
                                    )
Lance Ricotta, an individual,       )
                                    )
            Petitioner,             )   37-2018-00058591
      v.                            )   PR-TR-CTL
                                    )
Thomas Ricotta, an individual       )
and Successor Trustee of the        )
ETL Trust UDT 3/30/2005;            )
Barry Fefferman, an individual;     )
Joan Walsh, an individual;          )
and Does 1-50,                      )
                                    )
            Respondents.            )
_____     )


Video Deposition of CYNTHIA ELIZABETH SPIER, M.D.
San Diego, California
Tuesday, March 10, 2020


Reported by:
Veronica S. Thompson
CSR 6056, RPR, CRR, CCRR
Shelburne Sherr Job 100144

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:39:02 | 1 | morning trying to recall Ellen, but I don't have the -- |
| 12:39:09 | 2 | I didn't have the paper chart that preceded our |
| 12:39:12 | 3 | electronic medical record. |
| 12:39:13 | 4 | Q. Great. Well, I'm going to help you hopefully |
| 12:39:16 | 5 | refresh some of your recollection and just maybe ask you |
| 12:39:18 | 6 | to interpret some of the charts that are kind of key to |
| 12:39:21 | 7 | this case. Okay? |
| 12:39:21 | 8 | A. Okay. |
| 12:39:23 | 9 | Q. And one of the key terms I want to make sure |
| 12:39:25 | 10 | that everybody sort of understands, is on the same page |
| 12:39:29 | 11 | with, is the term "severe aphasia," and that's kind of |
| 12:39:34 | 12 | one of the key terms in this case, and we'll go ahead |
| 12:39:36 | 13 | and mark this as Exhibit 1, if we could. This is the |
| 12:39:49 | 14 | trusty source of WebMD. |
| | 15 | (Exhibit 1 was marked for identification.) |
| | 16 | BY MR. MORRIS: |
| | 17 | Q. So -- |
| 12:39:54 | 18 | A. Could I interrupt you -- |
| 12:39:55 | 19 | Q. Certainly. |
| 12:39:55 | 20 | A. -- and just say it's pronounced aphasia, but |
| 12:39:58 | 21 | that's -- |
| 12:39:59 | 22 | Q. Perfect. |
| 12:39:59 | 23 | A. Aphasia. |
| 12:40:01 | 24 | Q. And I would have absolutely no problem with |
| 12:40:03 | 25 | you correcting any of my -- |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:40:06 | 1 | A.   Okay. |
| 12:40:06 | 2 | Q.   -- nomenclature.  Okay?  Thank you. |
| 12:40:07 | 3 | So there's expressive aphasia, which -- |
| 12:40:12 | 4 | laymen's terms means just difficulty speaking.  Fair? |
| 12:40:16 | 5 | A.   Fair. |
| 12:40:16 | 6 | Q.   Receptive:  difficulty understanding? |
| 12:40:20 | 7 | A.   Correct. |
| 12:40:20 | 8 | Q.   And then if you turn the page, there's a |
| 12:40:24 | 9 | paragraph that lays out the difference between aphasia |
| 12:40:29 | 10 | and severe aphasia.  And it's right under -- see where |
| 12:40:33 | 11 | it says "What are the symptoms" and then there's a -- |
| 12:40:36 | 12 | A.   Uh-huh. |
| 12:40:36 | 13 | Q.   Oh, excuse me. |
| 12:40:37 | 14 | A.   Yes. |
| 12:40:38 | 15 | Q.   Right under "Primary progressive" at the |
| 12:40:41 | 16 | top -- |
| 12:40:41 | 17 | A.   Yes. |
| 12:40:41 | 18 | Q.   -- it says, "Aphasia may be mild or severe." |
| 12:40:43 | 19 | Do you see that? |
| 12:40:43 | 20 | A.   Yes. |
| 12:40:44 | 21 | Q.   It says, "Severe aphasia limits the person's |
| 12:40:48 | 22 | ability to communicate.  The person may say little. |
| 12:40:51 | 23 | They may not participate in or understand any |
| 12:40:54 | 24 | conversation." |
| 12:40:55 | 25 | Can we go ahead and, for purposes of this |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:40:57 | 1 | deposition, use that definition for severe aphasia? |
| 12:41:01 | 2 | A.   I -- I might not be that strict.  I might have |
| 12:41:06 | 3 | called Ellen to have severe aphasia, and it might not |
| 12:41:11 | 4 | have been -- what you have to notice in here, this |
| 12:41:16 | 5 | definition -- it says, "may say little and may not |
| 12:41:20 | 6 | participate in or understand any conversation."  It |
| 12:41:24 | 7 | doesn't mean they don't. |
| 12:41:26 | 8 | Q.   Okay. |
| 12:41:26 | 9 | A.   Okay?  And so severe can be limited, very |
| 12:41:31 | 10 | limited, but it doesn't mean that they don't understand |
| 12:41:35 | 11 | any conversation -- |
| 12:41:36 | 12 | Q.   Okay. |
| 12:41:37 | 13 | A.   -- so I just want you to be aware of that. |
| 12:41:40 | 14 | Q.   Sure.  So when you use the term "severe |
| 12:41:43 | 15 | aphasia" in your everyday interaction and charting, |
| 12:41:48 | 16 | would you adopt sort of this definition which is "may |
| 12:41:54 | 17 | not participate" or has very limited -- what -- |
| 12:42:00 | 18 | A.   I would say -- |
| 12:42:00 | 19 | Q.   I guess I'm confused by your -- by your |
| 12:42:02 | 20 | clarification. |
| 12:42:03 | 21 | A.   Okay.  I would probably -- be better if I |
| 12:42:06 | 22 | described what they could do in the chart, and there may |
| 12:42:10 | 23 | be notes that I don't because I felt that I did it |
| 12:42:14 | 24 | beforehand. |
| 12:42:16 | 25 | So if I wrote in the chart "severe aphasia" |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:42:19 | 1 | and I didn't write any tasks that I did, like followed a |
| 12:42:23 | 2 | three-step, followed a two-step, followed a one-step |
| 12:42:28 | 3 | command -- if I didn't write anything, it may have been |
| 12:42:32 | 4 | because I did it on a previous visit.  Okay?  But |
| 12:42:36 | 5 | there's a range of severe. |
| 12:42:39 | 6 | Q.    Sure. |
| 12:42:40 | 7 | A.    It just means they're pretty limited. |
| 12:42:42 | 8 | Q.    Okay.  So we go with -- I think you -- earlier |
| 12:42:45 | 9 | testimony was it could mean they cannot participate or |
| 12:42:49 | 10 | understand or very limited ability to participate or |
| 12:42:52 | 11 | understand.  Go with that definition? |
| 12:42:57 | 12 | MR. ABBOTT:  Misstates her testimony. |
| 12:42:58 | 13 | THE WITNESS:  I -- I just want to say that in |
| 12:43:00 | 14 | this case I don't want to be pinned down to a |
| 12:43:04 | 15 | definition.  I would rather be based on what I have |
| 12:43:08 | 16 | written in the chart and the objective findings and |
| 12:43:12 | 17 | notes but, in general, yes. |
| 12:43:15 | 18 | BY MR. MORRIS: |
| 12:43:15 | 19 | Q.    Okay.  Perfect.  And I don't blame you at all |
| 12:43:19 | 20 | for wanting to refer to your charts. |
| 12:43:22 | 21 | (To court reporter)  So maybe you can just |
| 12:43:24 | 22 | hand me the -- |
| | 23 | (Discussion off the record.) |
| | 24 | (Exhibit 2 was marked for identification.) |
| | 25 | /// |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:57:17 | 1 | 70 percent correct. |
| 12:57:19 | 2 | Q.   Then your objective diagnosis there is, |
| 12:57:22 | 3 | severe, underline, receptive and expressive aphasia? |
| 12:57:26 | 4 | A.   Right.  And you can see that she -- she wasn't |
| 12:57:29 | 5 | able to name objects either.  She -- |
| 12:57:33 | 6 | Q.   What -- |
| 12:57:34 | 7 | A.   She called -- |
| 12:57:34 | 8 | Q.   Oh. |
| 12:57:34 | 9 | A.   -- the -- she said "jack" for jacket. |
| 12:57:38 | 10 | And then, underneath that, she was able to |
| 12:57:41 | 11 | repeat a simple sentence. |
| 12:57:43 | 12 | And then my -- my impression is that she did |
| 12:57:48 | 13 | have a severe -- and this is a severe -- |
| 12:57:50 | 14 | receptive/expressive aphasia. |
| 12:57:54 | 15 | Q.   And in this context severe receptive means she |
| 12:57:57 | 16 | can't understand or a very limited understanding of the |
| 12:58:00 | 17 | words that were being said? |
| 12:58:01 | 18 | A.   She had very limited -- if you -- if you are |
| 12:58:05 | 19 | getting 50 percent of a simple yes-and-no question, |
| 12:58:11 | 20 | that's basically guessing.  That's what you would get if |
| 12:58:15 | 21 | you were guessing. |
| 12:58:16 | 22 | And people with aphasia -- another thing |
| 12:58:19 | 23 | that's really important to understand about aphasia that |
| 12:58:22 | 24 | a lot of people don't know is that the right hemisphere, |
| 12:58:29 | 25 | the one that's intact, is the one that processes our |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 12:58:33 | 1 | intonation. |
| 12:58:35 | 2 | So you could understand by my intonation that |
| 12:58:39 | 3 | I was asking you a question, and you might answer yes or |
| 12:58:42 | 4 | no or nod your head yes or no, but the words would be, |
| 12:58:46 | 5 | like, totally you wouldn't understand anything. |

```
12:58:51   6        Q.   Gotcha.

12:58:51   7        A.   So a lot of times families will think that

12:58:56   8   their family member understands a lot more than they do

12:59:00   9   because the patient responds to the intonation.  Also, a

12:59:08  10   lot of times families will gesture.  They'll say

12:59:12  11   something like, "Lift your arm up, Mom.  Come on."  And

12:59:17  12   then mom will lift the arm up, and then they think that

12:59:20  13   she's understanding.  Or they'll say, "Look who's here:

12:59:24  14   Bobby.  Aren't you happy to see him?"

12:59:27  15        Q.   And they'll just --

12:59:28  16        A.   And then -- "yes."  And, you know, it's the

12:59:30  17   intonation that tells you it's a question.

12:59:34  18        Q.   And that's controlled by the right --

12:59:36  19        A.   So when I --

12:59:36  20        Q.   Yeah.

12:59:36  21        A.   When I see 50 percent on a simple yes-or-no

12:59:43  22   question -- and I'm talking simple yes-or-no question,

12:59:45  23   like "Is it raining?  Is it nighttime?  Do you live in

12:59:50  24   Chicago?  Do you live in San Diego?"  Those are the

12:59:53  25   kinds of things I personally would be asking on a simple
```

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| 12:59:57 | 1 | yes-or-no. |
| 12:59:58 | 2 | When I see 50 percent, simple yes/no, I know |
| 01:00:01 | 3 | right now, looking at this note, that she had a severe |
| 01:00:06 | 4 | receptive impairment. |
| 01:00:09 | 5 | Q. 50 percent is basically a guess? |
| 01:00:11 | 6 | A. You can get 50 percent with guessing. |
| 01:00:14 | 7 | Q. And I know that from my high school true/false |
| 01:00:17 | 8 | questions. |
| 01:00:23 | 9 | And from the fact that she -- if we can go |
| 01:00:27 | 10 | back to that definition where there's, you know, very |
| 01:00:30 | 11 | limited or no understanding on the receptive phase -- I |
| 01:00:35 | 12 | mean, can you say defin- -- can you say that she wasn't |
| 01:00:39 | 13 | understanding anything or -- or -- |
| 01:00:40 | 14 | A. No. She's -- |
| 01:00:40 | 15 | Q. -- just very, very limited? |
| 01:00:42 | 16 | A. She's understanding some things. She could |
| 01:00:44 | 17 | follow simple commands with 70 percent accuracy; so she |
| 01:00:49 | 18 | was getting some things, but she wasn't getting all of |
| 01:00:56 | 19 | it. |
| 01:00:57 | 20 | Q. Gotcha. |
| 01:00:58 | 21 | A. And, again, a simple command is something like |
| 01:01:01 | 22 | "Close your eyes. Open your mouth. Stick out your |
| 01:01:05 | 23 | tongue." That's a simple command. |
| 01:01:07 | 24 | Q. Getting 70 percent of that right would |
| 01:01:10 | 25 | indicate to you a severe receptive dis- -- inability? |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

01:01:15   1        A.   Yeah, yeah.   She -- by the whole exam, you can
01:01:16   2   say she was severely impaired.
01:01:20   3        Q.   Is this a -- is this a mental -- like a
01:01:22   4   mini-mental exam?
01:01:23   5        A.   No.
01:01:23   6        Q.   I see that in --
01:01:24   7             What is a mini-mental exam?
01:01:26   8        A.   A mini-mental -- a mini-mental exam looks
01:01:31   9   for -- is a screening tool for dementia.
01:01:34  10             And I want to explain something to you,
01:01:37  11   everyone.
01:01:40  12             Before I went to medical school, I was a
01:01:42  13   speech-language pathologist.   I have a master's degree
01:01:45  14   in speech and hearing; so I know aphasia very well.   And
01:01:50  15   I know it more than the other colleagues, and that's why
01:01:55  16   their terminology might not be very specific.
01:02:00  17        Q.   Uh-huh.
01:02:00  18        A.   Okay?
01:02:01  19             So I know exactly what I was doing here.   I
01:02:07  20   practiced speech pathology for ten years before I went
01:02:10  21   to med school and became a neurologist.
01:02:14  22             So this gal had a severe receptive/expressive
01:02:18  23   aphasia, and you can't make comments about her mentation
01:02:24  24   like memory and things like that.   You can't assess it.
01:02:27  25   When somebody has a severe language deficit, you can't

Case 3:22-cv-01791-WQH-AHG   Document 5-1   Filed 12/12/22   PageID.144   Page 31 of 51

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:12:19 | 1 | gotten any better? |
| 01:12:20 | 2 | MR. ABBOTT:  Same objection.  Asked and |
| 01:12:22 | 3 | answered now. |
| 01:12:24 | 4 | BY MR. MORRIS: |
| 01:12:24 | 5 | Q.   You can answer. |
| 01:12:25 | 6 | A.   Can I answer it? |
| 01:12:26 | 7 | Q.   Yeah. |
| 01:12:27 | 8 | A.   Okay.  It doesn't appear that she's gotten any |
| 01:12:29 | 9 | better with her language skills. |
| 01:12:33 | 10 | Q.   And it would be outside the norm and outside |
| 01:12:37 | 11 | any medical literature that I find that she would |
| 01:12:39 | 12 | have -- in between this 1/12 and 1/22 to have, like, you |
| 01:12:43 | 13 | know, windows of lucidity. |
| 01:12:45 | 14 | A.   She would not. |
| 01:12:57 | 15 | Q.   And, if you can tell me, would a person in |
| 01:13:00 | 16 | this condition be able to read, comprehend |
| 01:13:04 | 17 | comprehensive, complex, detailed legal documents? |
| 01:13:08 | 18 | MR. ABBOTT:  Objection.  Lack of foundation, |
| 01:13:10 | 19 | vague as to time. |
| 01:13:14 | 20 | Let's not try to trap the good doctor into a |
| 01:13:17 | 21 | forensic opinion, Counsel. |
| 01:13:18 | 22 | BY MR. MORRIS: |
| 01:13:18 | 23 | Q.   You can answer. |
| 01:13:19 | 24 | A.   Well, I think, you know, I would say that I |
| 01:13:22 | 25 | can make a comment on that because she's got a severe |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:13:28 | 1 | receptive aphasia.  And reception is listening and |
| 01:13:33 | 2 | reading.  So reading something is the same as listening. |
| 01:13:39 | 3 | They're both words. |
| 01:13:40 | 4 | And she's only processing -- she's only |
| 01:13:45 | 5 | following very simple commands such as, you know, |
| 01:13:50 | 6 | stick -- even with very simple things like "Close your |
| 01:13:54 | 7 | eyes" and "Stick out your tongue," she gets 70 percent |
| 01:13:57 | 8 | correct.  So she's even missing something really simple. |
| 01:14:02 | 9 | You would not expect somebody with that degree |
| 01:14:05 | 10 | of receptive involvement to understand a couple of |
| 01:14:10 | 11 | sentences even. |
| 01:14:13 | 12 | Q.   Thank you. |
| | 13 | (Exhibit 8 was marked for identification.) |
| 01:14:22 | 14 | BY MR. MORRIS: |
| 01:14:23 | 15 | Q.   And then I have this note.  We'll mark this as |
| 01:14:26 | 16 | Exhibit 8, but it's pretty much the same note, just in a |
| 01:14:28 | 17 | different format.  And I was just confused as to why -- |
| 01:14:31 | 18 | I mean, it is almost word for word the same note, but it |
| 01:14:36 | 19 | just shows up twice in a different format.  Maybe you |
| 01:14:39 | 20 | could help explain that. |
| 01:14:42 | 21 | MS. BURD:  Do you have copies? |
| 01:14:43 | 22 | MR. MORRIS:  Oh, I'm sorry. |
| 01:14:44 | 23 | THE WITNESS:  This is the same note.  This is |
| 01:14:45 | 24 | the same note.  One -- it's -- |
| 01:14:50 | 25 | /// |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

01:26:40  1    BY MR. MORRIS:

01:26:40  2         Q.   So the question that I -- you can see that

01:26:42  3    these are sort of complex legal documents.

01:26:45  4         A.   Uh-huh, yes.

01:26:47  5         Q.   And these were allegedly signed by

01:26:51  6    Miss Ricotta on January 29, 2007.

01:26:58  7              Now, given the condition of her left lobe and

01:27:00  8    that she's right-handed, would you have expected

01:27:03  9    Miss Ricotta to be able to physically actually sign

01:27:06 10    something in January 29, '07, or can you tell?

01:27:15 11              MR. ABBOTT:  Lack of foundation.

01:27:18 12              THE WITNESS:  I don't have any -- I didn't

01:27:20 13    assess her writing in my exam.  There's no documentation

01:27:28 14    that I asked her to sign her name.

01:27:31 15              But I will say that a signature is -- is

01:27:37 16    something that's almost automatic because it's something

01:27:41 17    that you do in your life over and over and over and over

01:27:45 18    again.  So it's possible that someone with severe

01:27:51 19    aphasia could sign their name.

01:27:52 20              MR. MORRIS:  Fair enough.

01:27:53 21    BY MR. MORRIS:

01:27:53 22         Q.   And based on the fact that on January 22,

01:27:55 23    2007, you had diagnosed her with severe receptive and

01:28:01 24    expressive aphasia, can you help us maybe inform or

01:28:04 25    render an opinion as to what the likelihood that she

Cynthia Elizabeth Spier, M.D. - 3/10/2020

01:28:07  1   would have been able to read, comprehend, and understand
01:28:10  2   these complex legal documents on January 29, 2007?
01:28:14  3            MR. ABBOTT:  Lack of foundation.
01:28:16  4            THE WITNESS:  I don't -- I don't see how she
01:28:18  5   would have been able to comprehend this -- document
01:28:22  6   number 11.
01:28:24  7   BY MR. MORRIS:
01:28:25  8       Q.   Great.  I still have seven minutes left, so I
01:28:28  9   would like to go back and do what I typically would have
01:28:32 10   done in the beginning, which is go over some of your
01:28:34 11   history and experience and education.
01:28:40 12            Tell us -- you said you had a -- you were a
01:28:44 13   speech pathologist before this?
01:28:46 14       A.   Yes.
01:28:46 15       Q.   Can you tell us where and -- and your
01:28:47 16   experience with that.
01:28:48 17       A.   Well, I graduated with a undergraduate at
01:28:51 18   UC Santa Barbara, and then --
01:28:54 19       Q.   Gaucho.
01:28:55 20       A.   -- I -- yes, Gaucho.
01:28:58 21            -- and then I got a master's in speech
01:29:01 22   pathology at the University of Arizona in Tucson.  And
01:29:06 23   then I practiced for ten years in a hospital setting.
01:29:13 24       Q.   So funny.  I just had a Kaiser case with a
01:29:17 25   spinal surgery, and the person who was doing the neuro

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:29:20 | 1 | monitoring was -- her background was speech pathology. |
| 01:29:23 | 2 | Did you do, like, neuro monitoring, or was |
| 01:29:26 | 3 | it -- |
| 01:29:26 | 4 | A.   No, I didn't do that. |
| 01:29:27 | 5 | Q.   And then after ten years of speech pathology |
| 01:29:30 | 6 | in a hospital -- |
| 01:29:31 | 7 | A.   Then I decided I wanted to become a |
| 01:29:34 | 8 | neurologist.  So I took all the premed classes and |
| 01:29:38 | 9 | applied to med school, and I went to the University of |
| 01:29:41 | 10 | Arizona in Tucson. |
| 01:29:43 | 11 | Q.   And upon graduating -- |
| 01:29:46 | 12 | A.   I did my intern year in Long Beach, and I did |
| 01:29:51 | 13 | my neurology residency at UC San Diego. |
| 01:30:00 | 14 | Q.   I went to UC San Diego, but, you know, we |
| 01:30:03 | 15 | lawyers went to Warren; we didn't go to Revelle.  I |
| 01:30:07 | 16 | imagine you went to Revelle? |
| 01:30:08 | 17 | A.   It was residency, so -- |
| 01:30:10 | 18 | Q.   Oh, that's right. |
| 01:30:10 | 19 | A.   -- it had nothing to do with the college. |
| 01:30:13 | 20 | Q.   And then where have you practiced after |
| 01:30:15 | 21 | leaving your residency? |
| 01:30:16 | 22 | A.   And I've practiced since then at Kaiser -- |
| 01:30:20 | 23 | Q.   Kaiser the whole time? |
| 01:30:21 | 24 | A.   -- right here. |
| 01:30:22 | 25 | Yes. |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 01:44:17 | 1 | fine.  Barry said he was in and out. |
| 01:44:21 | 2 | BY MR. ABBOTT: |
| 01:44:21 | 3 | Q.   And all of that took place at Stanford Court, |
| 01:44:23 | 4 | the nursing facility -- skilled nursing facility in |
| 01:44:26 | 5 | Santee. |
| 01:44:27 | 6 | A.   Okay. |
| 01:44:30 | 7 | Q.   I want to harken back for a minute to your |
| 01:44:33 | 8 | testimony about how a person suffering from some form of |
| 01:44:40 | 9 | aphasia could be reacting to the tone of a question in |
| 01:44:49 | 10 | signaling agreement or disagreement even if they're |
| 01:44:52 | 11 | maybe not even understanding what's happening. |
| 01:44:54 | 12 | A.   Yes. |
| 01:44:56 | 13 | Q.   You recall that testimony.  Right? |
| 01:44:57 | 14 | A.   Yes. |
| 01:44:57 | 15 | Q.   Okay.  And I took from your testimony that you |
| 01:45:02 | 16 | felt that that phenomenon could cause family members in |
| 01:45:06 | 17 | certain instances to mistake a person's yes or no or |
| 01:45:11 | 18 | their -- their agreement with a request or a command as |
| 01:45:16 | 19 | an actual knowing, an intentional request, one in which |
| 01:45:20 | 20 | they understood the question, when, in fact, the person |
| 01:45:23 | 21 | may not actually understand what's happening.  Is that a |
| 01:45:25 | 22 | fair characterization? |
| 01:45:27 | 23 | A.   It is.  I've seen it many times. |
| 01:45:30 | 24 | Q.   What about in the scenario where that same |
| 01:45:32 | 25 | person that's suffering from the aphasia actually, |

SHELBURNE SHERR COURT REPORTERS, INC.  (619) 234-9100
www.sscourtreporters.com

52

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| 01:53:54 | 1 | MR. ABBOTT:  I was quiet -- |
| 01:53:54 | 2 | MR. MORRIS:  -- record. |
| 01:53:54 | 3 | MR. ABBOTT:  -- and I didn't testify -- |
| 01:53:58 | 4 | MR. MORRIS:  Well -- |
| 01:54:05 | 5 | (Reporter interrupts overlapping speakers.) |
| 01:54:05 | 6 | THE REPORTER:  Back on the record when you're |
| 01:54:05 | 7 | ready. |
| 01:54:05 | 8 | MR. MORRIS:  Big difference. |
| 01:54:10 | 9 | THE WITNESS:  I forgot your question.  I |
| 01:54:12 | 10 | apologize. |
| 01:54:13 | 11 | BY MR. ABBOTT: |
| 01:54:13 | 12 | Q.   My question is whether or not you're aware |
| 01:54:15 | 13 | whether Mrs. Ricotta had discussions with her attorney |
| 01:54:21 | 14 | and others about her estate planning intentions in the |
| 01:54:25 | 15 | months before her surgery. |
| 01:54:27 | 16 | A.   No, I don't know that. |
| 01:54:28 | 17 | Q.   Do you have any knowledge about her prior |
| 01:54:30 | 18 | intentions or plans with respect to her estate planning? |
| 01:54:32 | 19 | A.   None. |
| 01:54:39 | 20 | Q.   Okay.  And then do you see in paragraph 8 |
| 01:54:42 | 21 | where Ms. Walsh says, quote, As was my custom and |
| 01:54:45 | 22 | practice at the time, I did not provide the |
| 01:54:48 | 23 | aforementioned documents to Ellen for signature until I |
| 01:54:52 | 24 | was satisfied based on our discussions that she |
| 01:54:54 | 25 | understood them, that they reflected her genuine wishes, |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

01:54:57  1    and that she was signing freely and not as a result of
01:55:01  2    undue influence by another.  It was clear to me from my
01:55:04  3    discussions with her that day that she understood the
01:55:05  4    terms contained in the documents, that the documents
01:55:07  5    reflected her genuine wishes, and that by signing them
01:55:10  6    she was doing so of her own free will.
01:55:12  7         A.   I see that, but --
01:55:15  8         Q.   I'll -- I'll -- I have a question coming.
01:55:17  9         A.   Okay.
01:55:17 10         Q.   So --
01:55:18 11         A.   Yes, I see that.
01:55:19 12         Q.   -- is -- is Ms. Walsh's description of
01:55:24 13    Mrs. Ricotta reflective of a different level of language
01:55:31 14    processing than the one you observed on January 22?
01:55:34 15    That's a yes-or-no question.
01:55:38 16         A.   I --
01:55:38 17              MR. MORRIS:  No, she doesn't have to answer
01:55:40 18    yes or no.
01:55:40 19              You can answer.
01:55:41 20              THE WITNESS:  I'm going -- I'm going to say I
01:55:43 21    don't know.  And I'm going to elaborate because I
01:55:48 22    just -- I want to do the best I can to help who's ever
01:55:54 23    making this decision understand that even other
01:56:00 24    neurologists are not describing the language abilities
01:56:05 25    very well because they don't have some of the background

**Cynthia Elizabeth Spier, M.D. - 3/10/2020**

| | | |
|---|---|---|
| 01:57:31 | 1 | Q. My question was whether or not what Ms. Walsh |
| 01:57:35 | 2 | is describing about her interaction with Ellen on |
| 01:57:39 | 3 | January 29, 2007, reflects a different level of language |
| 01:57:47 | 4 | processing than what you observed on January 22. |
| 01:57:51 | 5 | MR. MORRIS: Asked and answered. She's given |
| 01:57:52 | 6 | you her answer. |
| 01:57:52 | 7 | THE WITNESS: I -- |
| 01:57:53 | 8 | MR. MORRIS: Do you have anything to add? |
| 01:57:54 | 9 | THE WITNESS: I'm going to -- I'm going to add |
| 01:57:55 | 10 | it -- I'm going to answer it again to just make it |
| 01:57:57 | 11 | clear. |
| 01:57:57 | 12 | MR. ABBOTT: Okay. |
| 01:57:58 | 13 | MR. MORRIS: Asked and answered. She can |
| 01:57:59 | 14 | answer as she sees fit. |
| 01:58:01 | 15 | THE WITNESS: I'm going to just answer. |
| 01:58:03 | 16 | I don't know because I don't know if the |
| 01:58:07 | 17 | attorney misinterpreted her understanding based on what |
| 01:58:14 | 18 | people commonly do with intonation and gestures and |
| 01:58:18 | 19 | nodding. Those are all nonverbal forms of |
| 01:58:22 | 20 | communication. |
| 01:58:24 | 21 | And a layperson may think -- even a |
| 01:58:29 | 22 | professional like a nurse practitioner may think that |
| 01:58:31 | 23 | someone is understanding a lot more than they actually |
| 01:58:34 | 24 | do. I often have to educate ICU nurses and other |
| 01:58:41 | 25 | doctors about what a patient can and cannot do. |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 02:36:52 | 1 | Q. When we talk about aphasia, does that |
| 02:36:55 | 2 | necessarily mean that a person does not at -- understand |
| 02:36:58 | 3 | what is being told to them? |
| 02:37:00 | 4 | A. Yes. If they have receptive aphasia, it means |
| 02:37:03 | 5 | that they are not comprehending. Receptive aphasia is |
| 02:37:06 | 6 | your ability to comprehend. |
| 02:37:12 | 7 | Q. Do you know whether Mrs. Ricotta was able to |
| 02:37:15 | 8 | accurately communicate her desires between January 22 |
| 02:37:19 | 9 | and February 16? |
| 02:37:21 | 10 | A. No. |
| 02:37:25 | 11 | Q. Do you know whether Mrs. Ricotta was |
| 02:37:27 | 12 | accurately able to communicate her desires on |
| 02:37:30 | 13 | February 22 -- or sorry -- on January 22? |
| 02:37:34 | 14 | A. January 22 -- was that the date -- |
| 02:37:37 | 15 | Q. 2007. |
| 02:37:37 | 16 | A. -- I saw her? |
| 02:37:38 | 17 | MR. MORRIS: Yes. |
| 02:37:39 | 18 | BY MS. BURD: |
| 02:37:40 | 19 | Q. Correct. |
| 02:37:42 | 20 | A. What I can tell you is that she was fluent but |
| 02:37:46 | 21 | she had a lot of errors. |
| 02:37:48 | 22 | Q. Uh-huh. |
| 02:37:49 | 23 | A. So her language was very impaired. |
| 02:37:52 | 24 | Q. Uh-huh. |
| 02:37:52 | 25 | A. Severely impaired. |

**Cynthia Elizabeth Spier, M.D. - 3/10/2020**

02:37:54  1          Q.    Okay.

02:37:54  2          A.    So she might be able to express some broken

02:37:58  3    ideas, but there wouldn't be anything complex.

02:38:03  4          Q.    Earlier you gave the example of -- of someone

02:38:06  5    who said, "Please hand me that pencil," but pointed at a

02:38:11  6    pen.  Correct?

02:38:12  7          A.    Correct.

02:38:13  8          Q.    Would it be fair to state that that person

02:38:16  9    accurately communicated what they wanted even though

02:38:20  10   they got the word right -- wrong?

02:38:22  11         A.    That -- that hypothetical, yes, they did

02:38:25  12   communicate.  I was showing you how you might

02:38:27  13   communicate and have an impairment but get your idea

02:38:31  14   across.

02:38:32  15         Q.    Uh-huh.  And on January 22 was Mrs. Ricotta

02:38:35  16   able to get her ideas across despite her impairments?

02:38:39  17         A.    No.

02:38:39  18         Q.    On --

02:38:41  19         A.    She was -- she was severely impaired.

02:38:43  20         Q.    On February 16 was Mrs. Ricotta able to get

02:38:46  21   her ideas across?

02:38:48  22         A.    Yes.

02:38:49  23         Q.    So at some point between January 22 and

02:38:52  24   February 16, 2007, Miss Ricotta improved sufficiently to

02:38:56  25   get her intentions and ideas across?

Cynthia Elizabeth Spier, M.D. - 3/10/2020

| | | |
|---|---|---|
| 03:24:14 | 1 | That's fine. |
| 03:24:15 | 2 | BY MR. STILWELL: |
| 03:24:15 | 3 |     Q.   That's -- but this is not his turn, so -- |
| 03:24:18 | 4 |     A.   Okay. |
| 03:24:18 | 5 |     Q.   So what I am hearing from you is that, based |
| 03:24:24 | 6 | off of your observations of her on the 22nd, okay, and |
| 03:24:28 | 7 | your observations of her on the -- on February 16th and |
| 03:24:35 | 8 | your experience and knowledge, that you do not believe |
| 03:24:41 | 9 | that she could understand certain things.  Is that |
| 03:24:43 | 10 | correct? |
| 03:24:43 | 11 |     A.   That's correct. |
| 03:24:44 | 12 |     Q.   Okay.  However, is it also true that, because |
| 03:24:49 | 13 | you were not in the room on January 29, you do not for |
| 03:24:55 | 14 | sure, 100 percent actually know that she didn't?  Is |
| 03:25:00 | 15 | that fair to say? |
| 03:25:01 | 16 |           MR. MORRIS:  Vague, overbroad. |
| 03:25:03 | 17 |           THE WITNESS:  I would say it's -- it's |
| 03:25:05 | 18 | 100 percent certain that my opinion is she would not |
| 03:25:11 | 19 | have been able to, based on looking at my exam on the |
| 03:25:17 | 20 | 22nd, that -- based on her exam on the 12th and on the |
| 03:25:23 | 21 | 22nd -- |
| 03:25:24 | 22 | BY MR. STILWELL: |
| 03:25:25 | 23 |     Q.   But I don't want your opinion at this point in |
| 03:25:27 | 24 | time. |
| 03:25:27 | 25 |           MR. MORRIS:  That's what you asked for. |

**Cynthia Elizabeth Spier, M.D. - 3/10/2020**

| | | |
|---|---|---|
| 03:42:11 | 1 | during that approximately one-month period she had ups |
| 03:42:15 | 2 | and downs on the steady improvement spectrum? |
| 03:42:18 | 3 | A.   Yes.  Most people do. |
| 03:42:36 | 4 | Q.   In terms of the aphasia that |
| 03:42:38 | 5 | Mrs. Ricotta -- strike that. |
| 03:42:42 | 6 | In terms of the aphasia that you observed in |
| 03:42:45 | 7 | Mrs. Ricotta on -- strike that.  Let me start over.  I |
| 03:42:55 | 8 | apologize. |
| 03:43:01 | 9 | On February 16 was Mrs. Ricotta's ability to |
| 03:43:11 | 10 | read and understand language different from her ability |
| 03:43:15 | 11 | to hear and understand the same language? |
| 03:43:23 | 12 | A.   Receptive language is two components.  It's |
| 03:43:29 | 13 | listening and processing and reading.  And those are |
| 03:43:34 | 14 | both receptive components.  And if you have a severe |
| 03:43:39 | 15 | impairment in your auditory, you will have a severe |
| 03:43:43 | 16 | impairment in your reading. |
| 03:43:47 | 17 | Did that answer your question? |
| 03:43:48 | 18 | Q.   Not exactly, although -- |
| 03:43:49 | 19 | A.   Because -- okay. |
| 03:43:49 | 20 | Q.   -- it helps me understand better. |
| 03:43:52 | 21 | A.   Try to ask me different.  Maybe I can do it. |
| 03:43:55 | 22 | Q.   The -- what I'm getting at is whether or not |
| 03:43:58 | 23 | when a person has what you refer to as a receptive |
| 03:44:01 | 24 | aphasia -- |
| 03:44:03 | 25 | A.   Yes. |

**SHELBURNE SHERR COURT REPORTERS, INC. (619) 234-9100**
**www.sscourtreporters.com**

03:44:03   1   Q.  -- does that present as a different level of
03:44:09   2   processing deficit depending on whether they're hearing
03:44:13   3   or reading? Or is the hearing and the reading just as
03:44:18   4   bad when someone has receptive aphasia?
03:44:23   5   A.  If -- it -- they're both receptive. And if
03:44:27   6   you have a severe impairment in one, you're going to
03:44:30   7   have a severe impairment in the other if it's all from
03:44:35   8   the aphasia.
03:44:39   9   Now, there are some times when people have
03:44:41 10 brain disorders in other places where they have more of
03:44:45 11 a problem with writing or they can write but not read,
03:44:52 12 but this is not this patient. This patient's going to
03:44:56 13 be equal.
03:44:58 14 Q.  So does that mean that when you observed
03:45:00 15 Mrs. Ricotta, for example, on January 22 that she would
03:45:05 16 have the same difficulty processing a sentence that was
03:45:12 17 read to her out loud as she would if she read it
03:45:16 18 herself?
03:45:16 19 A.  She's going to have about the same deficit,
03:45:19 20 yes.
03:45:20 21 Q.  And when you say "about the same," are you
03:45:24 22 qualifying it for some reason?
03:45:26 23 A.  Yeah.
03:45:27 24 Q.  And why is that?
03:45:28 25 A.  Because if I tested her and had her read it

**Cynthia Elizabeth Spier, M.D. - 3/10/2020**

| | | |
|---|---|---|
| 03:57:30 | 1 | just give them commands and things to find out what is |
| 03:57:34 | 2 | that brain actually processing. And I would say that |
| 03:57:39 | 3 | the attorney probably believed that she understood.  She |
| 03:57:43 | 4 | probably -- her declaration -- I would say -- I would |
| 03:57:46 | 5 | trust that the attorney believed that she did. |
| 03:57:50 | 6 | Q.   And -- and part of the attorney's testimony |
| 03:57:52 | 7 | was that Mrs. Ricotta herself spoke back to the attorney |
| 03:57:55 | 8 | and described what she wanted. |
| 03:57:58 | 9 | MR. MORRIS:  Misstates testimony. |
| 03:57:58 | 10 | BY MR. ABBOTT: |
| 03:57:59 | 11 | Q.   Are you -- you recall I read you that -- that |
| 03:58:01 | 12 | passage? |
| 03:58:02 | 13 | A.   Yeah, I recall that. |
| 03:58:03 | 14 | Q.   Are you -- what's your take on the likelihood |
| 03:58:05 | 15 | that that really happened?  Is it that it happened and |
| 03:58:07 | 16 | the attorney just didn't understand what the words were |
| 03:58:11 | 17 | that were coming out of her mouth, or is it that it's |
| 03:58:13 | 18 | unlikely that Mrs. Ricotta actually said anything to |
| 03:58:15 | 19 | her? |
| 03:58:15 | 20 | A.   I wasn't there, so I can't, like -- I can't |
| 03:58:20 | 21 | sit there and pick apart that and say where the flaws |
| 03:58:23 | 22 | were, but it -- the whole situation is flawed. |
| 03:58:28 | 23 | Q.   What does that mean, "flawed"? |
| 03:58:30 | 24 | A.   The whole -- the whole entire exchange of |
| 03:58:37 | 25 | reading the agreement, explaining the agreement, having |

Cynthia Elizabeth Spier, M.D. - 3/10/2020

03:58:41　1　her express her understanding. Because she was so
03:58:47　2　aphasic, I think the whole situation cannot be trusted,
03:58:53　3　not that you can't trust the attorney, who I'm sure
03:58:59　4　believes that she -- that she understood it. She -- she
03:59:03　5　wouldn't have testified to that.

03:59:06　6　　　　Q.　I guess --

03:59:07　7　　　　A.　I trust -- I trust her deposition.

03:59:09　8　　　　Q.　I guess --

03:59:09　9　　　　A.　Her declaration.

03:59:11　10　　　　Q.　I guess what I'm wondering is, if Mrs. Ricotta
03:59:14　11　speaks words that are generally understood in English to
03:59:16　12　convey certain concepts given, the conditions that you
03:59:21　13　observed her to have at that time, does that mean that
03:59:25　14　the words had no meaning to Mrs. Ricotta and she was
03:59:29　15　just parroting back things? Does that mean that
03:59:31　16　Mrs. Ricotta meant it and had a moment of clarity?

03:59:36　17　　　　A.　Well, I think --

03:59:36　18　　　　Q.　What's the explanation?

03:59:37　19　　　　A.　-- it's a -- it's a good point that you make
03:59:39　20　because there's a condition called perseveration in
03:59:45　21　aphasia. And perseveration is repeating the same thing
03:59:50　22　over and over again.

03:59:53　23　　　　And you saw in her very -- you know, very
03:59:55　24　first exam with Dr. Rawat that she perseverated. Right?
04:00:01　25　She said she perseverated. And perseveration is, like,

**Cynthia Elizabeth Spier, M.D. - 3/10/2020**

1                DECLARATION UNDER PENALTY OF PERJURY

2

3           I, Cynthia Elizabeth Spier, M.D., the witness

4    herein, declare under penalty of perjury that I have

5    read the foregoing in its entirety; and that the

6    testimony contained herein is a true and accurate

7    transcription of my testimony elicited at said time and

8    place.

9           Executed this _____ day of _____,

10   20_____.

11

12                          _____

13                          Cynthia Elizabeth Spier, M.D.

14

15

16

17

18

19

20

21

22

23

24

25

**Cynthia Elizabeth Spier, M.D. - 3/10/2020**

1    REPORTER'S CERTIFICATE

2

3         I, Veronica S. Thompson, Certified Shorthand

4    Reporter for the State of California, do hereby certify:

5         That the witness named in the foregoing

6    deposition was by me duly sworn; that the deposition was

7    then taken before me at the time and place herein set

8    forth; that the testimony and proceedings were reported

9    stenographically by me and were transcribed through

10   computerized transcription by me; that the foregoing is

11   a true record of the testimony and proceedings taken at

12   that time; and that I am not interested in the event of

13   the action.

14        Witness my hand dated March 23, 2020.

15

16

17        _Veronica S Thompson_

18        Veronica S. Thompson

19        CSR 6056, RPR, CRR

20

21

22

23

24

25

# EXHIBIT 4

<div align="center">

**SUPERIOR COURT OF CALIFORNIA,**
**COUNTY OF SAN DIEGO**
**CENTRAL**

**MINUTE ORDER**

</div>

DATE: 02/22/2019                      TIME: 10:30:00 AM         DEPT:  C-64

JUDICIAL OFFICER PRESIDING: John S. Meyer
CLERK:  Herlinda Chavarin
REPORTER/ERM: Dulcemaria Duarte CSR 13968
BAILIFF/COURT ATTENDANT:  J. Pedroza/Z. Nuheir

CASE NO: **37-2018-00062311-CU-FR-CTL**  CASE INIT.DATE: 12/11/2018
CASE TITLE: **Ricotta vs Ricotta [IMAGED]**
CASE CATEGORY: Civil - Unlimited      CASE TYPE: Fraud

---

**EVENT TYPE:** Motion Hearing (Civil)

---

**APPEARANCES**
Christopher S Morris, counsel, present for Plaintiff(s).
Daniel W Abbott, counsel, present for Defendant(s).
Iris Gomez, counsel, is present for Defendants Barry Fefferman and The Bit Company

The Court hears oral argument and CONFIRMS the tentative ruling as follows:

Plaintiff Lance Z. Ricotta brings this motion, seeking an order appointing a receiver and issuing a preliminary injunction.

"A receiver may be appointed, in the manner provided in this chapter, by the court in which an action or proceeding is pending in any case in which the court is empowered by law to appoint a receiver." CCP §564(a).

"A receiver may be appointed by the court in which an action or proceeding is pending ...[i]n an action ... between partners or others jointly owning or interested in any property or fund, on the application of the plaintiff, or of any party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and where it is shown that the property or fund is in danger of being lost, removed, or materially injured." CCP §564(b)(1).

"The appointment of a receiver is a drastic remedy, may involve unnecessary expense and hardship and courts carefully weigh the propriety of such appointment in exercising their discretion to appoint a receiver particularly if there is an alternative remedy." *Hoover v. Galbraith* (1972) 7 Cal.3d 519, 528.

Plaintiff has not shown that it is probable that Lancair Corporation "is in danger of being lost, removed, or materially injured."  Plaintiff asserts that corporation is being mismanaged and that the corporation is being used for personal gain.  But what the evidence demonstrates is that Ms. Goddard and Mr. Kirsch did not have sufficient information and/or documents needed to analyze Lancair's books and evaluate

---

DATE: 02/22/2019                      MINUTE ORDER                           Page 1
DEPT:  C-64                                                        Calendar No. 28

CASE TITLE: Ricotta vs Ricotta [IMAGED]          CASE NO: **37-2018-00062311-CU-FR-CTL**

the company.

There is the possibility that Defendants Thomas D. Ricotta and Jeanne Ricotta may attempt to proceed with the proposed sale of the business, without plaintiff's approval or without time to analyze the Lancair's books. But that fact does not support the appointment of a receiver. Injunctive relief would suffice.

**THEREFORE**, Defendants Thomas D. Ricotta and Jeanne Ricotta are hereby enjoined from selling Lancair Corporation until further order of this court.   It would be in the best interests of all parties if the parties would arrange for a face to face meeting between Ms. Goddard and Mr. Fefferman to jointly review the books as soon as possible.

The Court confirms without prejudice for defendant to file an Application for a Bond.

**IT IS SO ORDERED:**

Judge John S. Meyer